
Scott J. Kaplan, OSB No. 913350
sjkaplan@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR  97204
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

FILED'07 OCT 16 14:15USDC-ORP

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

CV '07 1 547    KI

| | |
|---|---|
| YACHT WEST, LTD., a Cayman Islands company, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTENSEN SHIPYARDS, LTD., a Washington corporation; and DAVID H. CHRISTENSEN, , <br><br> Defendants. | Civil No. _____ <br><br> COMPLAINT (Fraudulent Inducement, Negligent Misrepresentation, Washington Consumer Protection Act, Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, Breach of Guaranty, Declaratory Judgment) <br><br> JURY TRIAL REQUESTED |

Plaintiff Yacht West, Ltd. ("Plaintiff") sues Christensen Shipyards, Ltd. ("CSY") and

David H. Christensen ("Christensen"), and alleges as follows:

## NATURE OF THE ACTION

1.      This action involves CSY's knowing deception of Plaintiff in connection with the

negotiation, consummation, and performance of a written contract for construction of a motor

yacht, and CSY's defective construction of the yacht subject to the contract.  Specifically, CSY

Page 1    -    COMPLAINT

*Leaf 17969*

made numerous materially false statements that induced Plaintiff to enter into a purchase

contract ("Contract") for an $18 million-plus yacht known as Christensen Hull 30 (the "Yacht"

or "Hull 30") and, thereafter, to enter into subsequent amendments and other construction

documents related thereto. Enabled by its fraudulent conduct, CSY then imposed extraordinary

charges on Plaintiff and caused delays in completing the Yacht, and otherwise constructed the

Yacht in a defective manner, thereby causing actual damages to Plaintiff of no less than

$5 million (plus punitive damages, incidental damages, interest, costs, and attorneys' fees).

## PARTIES

2.      Plaintiff is a corporation organized under the laws of the Cayman Islands, with its

principal place of business at Campbell Corp. Services, Ltd., Scotia Center, PO Box 268 GT,

Grand Cayman Islands. Mr. Charles West ("West") is the sole shareholder of Plaintiff. West is

a resident and citizen of Broward County, Florida.

3.      Defendant CSY is a Washington corporation with its principal place of business at

4400 SE Columbia Way, Vancouver, Washington.

4.      Defendant Christensen is the Chief Executive Officer of CSY and a resident and

citizen of Washington.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 USC

§ 1332(a)(2) because the matter in controversy exceeds the sum of $75,000, exclusive of interest

and costs, and is between a citizen of a state and a subject of a foreign state.

6.      The parties have contractually agreed that personal jurisdiction and venue shall lie

exclusively in the U.S. District Court for the District of Oregon, Portland Division, for the claims

asserted herein.

Page 2    -    COMPLAINT

## RELEVANT AGREEMENTS

7.      Pursuant to a Construction Contract and Security Agreement dated as of April 21, 2004, Intracoastal Yacht, Ltd. ("Intracoastal") agreed to purchase the Yacht from CSY.  A genuine copy of this Contract is attached hereto as Exhibit 1.  West is the sole shareholder of Intracoastal.

8.      On October 25, 2004, Intracoastal and CSY entered into an Amendment to Christensen Shipyard, Ltd. Construction Contract and Security Agreement addressing certain limited disputes between Plaintiff and CSY (the "Amendment").  A genuine copy of the Amendment is attached hereto as Exhibit 2.

9.      On February 21, 2005, Intracoastal and CSY entered into an Assignment of Contract ("Assignment"), pursuant to which all of Intracoastal's rights, title, and interest under the Contract, Amendment, and otherwise relating to the Yacht were assigned to Plaintiff.  A genuine copy of the Assignment is attached hereto as Exhibit 3.  Together, Exhibits 1, 2, and 3 are referred to herein as the "Contract."

10.      Pursuant to a Guaranty dated as of April 21, 2004, Christensen guaranteed, among other things, "the due, prompt and faithful performance of, and compliance with, all obligations, covenants, terms, conditions, warranties and undertakings of Builder contained in the Contract * * * in accordance with the respective terms thereof."  The Guaranty is an "absolute, unconditional, present and continuing guaranty of payment, performance, and compliance."  A genuine copy of this Guaranty is attached hereto as Exhibit 4.

/ / / / /

/ / / / /

/ / / / /

Portlnd3-1602263.1 0038448-00001

## FACTS RELEVANT TO ALL COUNTS

11.     In the fall of 2003, CSY, through its agent and authorized representative, Wesley Dickman ("Dickman"), offered to build and sell to Plaintiff a motor yacht, known as Christensen Hull 29.

12.     The offer to sell Hull 29 to Plaintiff was conveyed by Dickman to Plaintiff through Plaintiff's representative, James McConville ("McConville") of International Yacht Collection.

13.     At all times material hereto, Dickman acted as the authorized representative and agent of CSY.

14.     In connection with making the offer, Dickman repeatedly represented to West, McConville, Plaintiff's design consultant Seann Pavlik ("Pavlik"), and Pavlik's design team, among other things, that as part of the base contract price for Hull 29, and at no additional charge, all wall wood, base wood, crown molding, and cabinetry would be included in Hull 29 "to the similar level of completion as Mystic" (another CSY motor yacht also known as Hull 24).

15.     Between 2003 and February 2004, Plaintiff and CSY negotiated the terms and conditions pursuant to which Plaintiff would purchase Hull 29.

16.     On September 16, 2003, CSY's President, Joe Foggia ("Foggia"), expressly confirmed  to Plaintiff Dickman's representations to McConville that West's yacht would be "fully outfitted to a similar level of completion as Mystic" as part of the base contract price.

17.     On February 10, 2004, CSY and Plaintiff reached the material terms of purchase, and, accordingly, a letter of intent was prepared for the parties to sign.

18.     At the Miami International Boat Show, which was held the week of February 12, 2004, Dickman again represented to McConville that all wall wood, base wood, crown molding,

Page 4    -    COMPLAINT

and cabinetry would be included in Hull 29 "to the similar level of completion as Mystic" as part of the base contract price.

19.     About one week after the Miami International Boat Show, Dickman informed Plaintiff that Hull 29 was no longer available but that CSY would sell Plaintiff Hull 30 on materially identical terms.

20.     In connection with making this offer to sell Plaintiff Hull 30, Dickman repeatedly represented (including on February 18 and March 10, 2004) to McConville, Pavlik, and Pavlik's design team, among other things, that:

        a.     Hull 30 "would be out of the mold by August, 2004, and there would be no problem delivering it to [Plaintiff] by the latest August, 2006"; and

        b.     As part of the base contract price for Hull 30, and at no additional charge, all wall wood, base wood, crown molding, and cabinetry would be included in Hull 30 "to the similar level of completion as Mystic" and would be built "per Mystic Standard."

21.     Between mid-February 2004 and April 2004, Plaintiff and CSY discussed various specifics about the design and construction of Hull 30.

22.     Among other things, in these discussions, Dickman repeatedly and consistently represented (including on February 18 and March 10, 2004) to West, McConville, Pavlik, Pavlik's design team, and the Captain of the Yacht, Trey Lockey ("Lockey"), that:

        a.     "[T]here would be no problem delivering [Hull 30] to [Plaintiff] by August, 2006";

        b.     As part of the base contract price for Hull 30, and at no additional charge, all wall wood, base wood, crown molding, and cabinetry would be included in Hull 30 "to the similar level of completion as Mystic"; and

Page 5   -   COMPLAINT

       c.      CSY would provide Plaintiff with "detailed drawings, plans, renderings, and specifications" for Hull 30.

23.     CSY's standard contract (as well as the Contract ultimately entered into by Plaintiff and CSY) includes certain "allowances" for construction charges that may exceed the base contract price of the purchased yacht (such as allowances for décor, navigation equipment and other items). One such allowance is the "décor allowance" for interior work over-and-above standard items included in the base contract price.

24.     With respect to the wall wood, base wood, crown molding, and cabinetry for Hull 30, not only did CSY represent in the negotiations that these items would be included in the base contract price "to the similar level of completion as Mystic," but Dickman also suggested in mid-February 2004 that the total "décor allowance" for additional over-and-above items (a part of which includes the wood) be reduced from $1,750,000 to $1,400,000 "because you won't be paying any extra for wood." In fact, Dickman referred to a diagram of the Yacht (dated March 25, 2004), and specifically represented to Plaintiff that Plaintiff would only pay for items marked with an "X" on the diagram.

25.     Also, in March 2004, Dickman provided McConville and Pavlik with "Mystic" brochures and pictures and reaffirmed the wood and cabinetry included on Hull 30 as part of the base contract price.

26.     Repeatedly, between December 2003 and April 2004, Dickman represented (including in mid-March) to McConville, Pavlik, and Pavlik's design team that 13,000 hours of CSY's time would be "sufficient to complete the entire décor" of Hull 30, including, without limitation, acquisition and installation of all wall wood, base wood, crown molding, and cabinetry.

Page 6  -  COMPLAINT

27.     Repeatedly between December 2003 and April 2004 (including on February 18, March 10, and April 20, 2004), Dickman represented that the wood and cabinetry seen on "Mystic" would be included in CSY's "standard boat."  He stated that "only those items above what you see [on "Mystic"] are extra and will be added on above the standard boat price."

28.     In April 2004, shortly before the Contract was signed, while the motor yacht "Mystic" was docked at Derecktor Shipyard (Dania, Florida), Dickman, McConville, West, Lockey, and a Pavlik design team member met on "Mystic" to discuss CSY's construction of Hull 30.  In that meeting, while identifying the specific wood as it appeared in "Mystic," Dickman repeatedly represented to Plaintiff that all such wall wood, base wood, crown molding, and cabinetry in "Mystic" would be included in Hull 30 "as part of the base contract price." During this meeting on "Mystic," Dickman telephoned Foggia in the presence of McConville, West, and Lockey, and Foggia expressly confirmed Dickman's representation that all wall wood, base wood, crown molding, and cabinetry in "Mystic" would be included in Hull 30 "as part of the base contract price."

29.     Induced by the foregoing representations, and in reasonable reliance thereon, on April 21, 2004, Plaintiff signed the initial Contract, agreeing to purchase Hull 30 for a base contract price of $15,850,000, and an "all in" price with all allowances of $18,100,000.

30.     That same day, April 21, 2004, Christensen signed the Guaranty.

31.     Despite numerous requests, CSY repeatedly failed to provide Plaintiff with the "detailed drawings, plans, renderings, and specifications" Dickman had promised, and instead Dickman repeatedly relied on comparisons to "Mystic" to describe the design, features, and in particular the wood that would be included in Hull 30 as part of the base contract price (and for no additional charge).  CSY's persistent failure to provide Plaintiff with these plans and

Page 7   -   COMPLAINT

drawings assisted CSY in concealing the falsity of its representations regarding, among other things, the wood features (and cost thereof) that would be included in Hull 30.

32.     On July 20, 2004, McConville, Pavlik, members of Pavlik's design team, Lockey, and various representatives of CSY (including Foggia and Dennis Frye) met at CSY's Vancouver, Washington, facilities.

33.     In the July 20, 2004 meeting, CSY disclosed to Plaintiff for the first time that CSY would not honor its agreement and repeated representations to include the wall wood, base wood, crown molding, and cabinetry "per Mystic standard" within the base contract price for Hull 30.

34.     In the July 20, 2004 meeting, Foggia and Frye represented to Plaintiff that the "additional cost [of the wall wood, base wood, crown molding, and cabinetry] would not exceed $270,000."

35.     McConville, as Plaintiff's representative, was angry and concerned by this proposed additional charge because it was directly in conflict with Dickman's repeated representations that all wall wood, base wood, crown molding, and cabinetry was included in the base contract price and Foggia's confirmations of Dickman's representations.

36.     In an apparent attempt to defuse the situation, Frye accompanied McConville, Lockey, Pavlik, and Pavlik's design team into a separate office and attempted to convince them that the $270,000 additional charge for such wood was "a deal."

37.     Specifically, Frye advised McConville and Pavlik of the over-and-above amounts paid for wall wood, base wood, crown molding, and cabinetry by other recent purchasers of CSY motor yachts.  Frye showed McConville and Pavlik certain confidential documents relating to these other purchasers that revealed the following:

Page 8   -   COMPLAINT

    a.    Hull 24 ("Mystic") – total cost of wall wood, base wood, crown molding, cabinetry, and other floor coverings (excluding marble) represented to be $607,817.78.

    b.    Hull 26 ("Privacy") – total cost of wall wood, base wood, crown molding, and cabinetry is confidential but was openly disclosed by Frye as being an exact amount consistent with the total cost of such items in "Mystic."

38.    Using this information regarding Hull 24 and Hull 26, Frye reassured McConville and Pavlik that the $270,000 in over-and-above charges for Hull 30 "was a bargain."

39.    At the July 20, 2004 meeting, Plaintiff was given spreadsheets by Frye, which indicated that only $270,000 had been allocated for such wood and millwork.

40.    On July 20, 2004, McConville also called and confronted Dickman about his prior inaccurate representations regarding the wood. Dickman admitted that both he and Foggia had represented to Plaintiff that Hull 30 would be "done to Mystic standard" as part of the base contract price and also reiterated and confirmed CSY's new representation that the over-and-above charges for wall wood, base wood, crown molding, and cabinetry would not exceed $270,000. However, in direct and knowing conflict with his numerous prior representations, after this telephone call that same day, Dickman completely reversed his story and claimed in writing to McConville that "the reference [to 'done to Mystic standard'] has nothing to do with what standard décor is but rather the fit and finish" of the wood.

41.    On July 21, 2004, McConville was clear in his written response to Dickman's explanation:

> "Wes, please stop sending me your bull****! Due to your leading us (five of us) into believing we are getting something we are not is turning a situation that is suppose[d] to be a fun and rewarding experience for our client into a very negative situation."

A genuine copy of McConville's written response is attached hereto as Exhibit 5.

Page 9  -  COMPLAINT

42.     In early August 2004, CSY once again altered its representations regarding the cost of the wood and cabinetry and suggested that the over-and-above cost of such items would not exceed $654,000.  Again, in these discussions, Dickman assured Plaintiff that $654,000 was a "deal."

43.     On October 25, 2004, CSY and Plaintiff entered into the Amendment to "resolve their differences" with respect to "certain costs of wood veneers and the wood wall paneling." The Amendment does not require CSY to do anything it was not already contractually obligated to do for Plaintiff, yet it requires Plaintiff to provide additional compensation to CSY.  Plaintiff had no reasonable alternative but to sign the Amendment with CSY due to, among other things, the state of construction of the Yacht, the Yacht's unique and specialty nature (it could not be obtained from any source other than CSY), CSY's threat to stop work on the construction of the Yacht, and the substantial amount of money Plaintiff already paid CSY, which CSY would not refund in full.  Further, CSY continued to deceive Plaintiff and conceal its ongoing and continuing fraudulent conduct by repeatedly making false representations about the specific wood features that would be included in Hull 30 and the cost thereof.

44.     Plaintiff was induced to sign the Amendment in reasonable reliance on CSY's and Dickman's repeated representations (as alleged above) to McConville, Pavlik, and Pavlik's design team that:

　　a.     The over-and-above cost of wall wood, base wood, crown molding, and cabinetry would "not exceed $270,000" and, subsequently, would never exceed $654,000; and

Page 10   -   COMPLAINT

b.    At $270,000, and, as subsequently stated, at $654,000, Plaintiff was "getting a super deal compared to the amounts paid by other owners" – specifically the owners of Hull 24 and Hull 26.

45.    Contrary to the repeated representations of CSY, the total over-and-above cost of the wall wood, base wood, crown molding, and cabinetry charged by CSY to Plaintiff is 1,900,313.40 (before credits), with a net minimum charge of $1,359,386.70.  The wood and cabinetry ultimately installed in Hull 30 is "per Mystic standard" or, in some instances, below Mystic standard in terms of quality and true cost.

46.    Contrary to the repeated representations of CSY, the amount charged to Plaintiff for the wall wood, base wood, crown molding, and cabinetry is grossly in excess of the amount represented to induce Plaintiff to enter into the Contract and the Amendment.

47.    Contrary to the repeated representations of CSY, the amount charged to Plaintiff for the wall wood, base wood, crown molding, and cabinetry is grossly in excess of the amounts allegedly paid by the owners of Hull 24 and Hull 26 and, therefore, is not "a super deal compared to amounts paid by other owners."

48.    Contrary to the repeated representations of CSY, CSY recorded 29,000 hours of time working on the décor of Hull 30, not 13,000 hours.  These additional hours have resulted in extraordinary and unnecessary expenses being incurred by Plaintiff and were the improper result of, among other things, CSY's falsely identifying problems in the design plans of premier yacht interior designer Pavlik Design as a means to increase the amount charged by CSY.  Again, CSY (through Dickman and Frye) confirmed that the décor of their other boats had been completed within the 13,000 hours allotted, and they had equal amounts of wood, or more.

Portlnd3-1602263.1 0038448-00001

49.     Contrary to the repeated representations of CSY, Hull 30 was not complete and was not delivered to Plaintiff as promised by August 2006.  On October 9, 2007, Hull 30 was completed and delivered to Plaintiff (with numerous material defects in its construction).  All delays in delivering Hull 30 after August 2006 were the result of the misconduct of CSY (including, without limitation, substantial delays caused by CSY falsely identifying problems with the design plans of Pavlik Design as alleged above).  Such delays have resulted in, among other things, Plaintiff's loss of charter income for the Yacht ($180,000 per week chartered).

50.     The motivation for CSY's excessive charges for the construction of the Yacht appears to be more than financial.  Specifically, in March 2006, CSY was involved in litigation over its construction of Hull 26 for an entity owned by professional golfer Tiger Woods.

51.     As part of the Woods litigation, CSY solicited affidavits from purchasers of CSY yachts that they were not motivated to buy a CSY yacht based on Woods' ownership of Hull 26.

52.     In response to CSY's solicitation, West refused to sign such an affidavit and advised CSY that he was in fact motivated to purchase a CSY yacht, in part, by Woods' purchase of Hull 26.

53.     Ever since West's refusal to sign the statement requested by CSY, Plaintiff has been riddled with numerous improper charges, excessive delays in completing the construction of Hull 30, and complete lack of cooperation and good faith by CSY.  Among other things, CSY placed Hull 31 in line for completion before Hull 30, even though it was sold after Hull 30.  The additional improper charges by CSY are no less than $1,200,000.

/ / / / /

/ / / / /

/ / / / /

Page 12   -   COMPLAINT

## DEFECTIVE CONSTRUCTION OF THE YACHT

### (Exhaust System)

54.     In material breach of the Contract, CSY designed and constructed an exhaust system forward of the propellers that excessively protrudes outward below the water line.

55.     The problems created by CSY's installation of the defective exhaust system include the discharge of fumes that will adversely affect the Yacht's guests and deteriorate the finishes and lifespan of the paint; the deposit of soot onto the side of the Yacht, requiring excessive crew expenditures to clean the Yacht and further deterioration of the paint; the need for excessive maintenance resulting from the protruding below-water system striking pylons, rocks, and other submerged articles; cavitation when the Yacht is moving; and reduction in top speed due to cavitation.  Further, if the protruding exhaust were to strike a pylon, rock, or other submerged article, one of the Yacht's engines could lose power, putting the passengers and crew at risk.  In addition, delivery of the Yacht was delayed so that experts could be retained to survey and opine on the exhaust issue.

56.     Plaintiff's damages associated with the exhaust system defect exceed $1 million.

### (Finish Bay)

57.     In material breach of the Contract, CSY failed to finish the Yacht in the protective environment of an appropriate "finish bay" – a departure from what CSY has done with other hulls it has completed – thereby exposing the Yacht to debris and external elements that diminish its quality.

58.     Despite Plaintiff's repeated requests, CSY continued to grind fiberglass and metal for other hulls within the same bay as the Yacht.

Page 13  -   COMPLAINT

59.    The problems created by CSY's refusal to locate the Yacht in an appropriate bay and to abstain from grinding fiberglass and metal near the Yacht include the adherence of fiberglass and metal dust to the Yacht's paint, which will result in premature deterioration of the paint; and contaminating the interior of the Yacht with fiberglass dust, which poses a significant respiratory risk and skin irritation to future guests on the Yacht.

60.    Plaintiff's damages associated with CSY's refusal to stow the Yacht in an appropriate finishing bay are estimated to exceed $800,000.

**(Engineering Plans)**

61.    In material breach of the Contract, CSY unreasonably and persistently found alleged and pretextual deficiencies in the engineering plans of premier yacht interior designer Pavlik Design.  This has increased the Yacht's total engineering costs by $160,000 over the amount originally represented by CSY, and $50,000 over a post-contract negotiated maximum of $275,443.

62.    CSY – under false pretext – claimed that Pavlik's plans were inadequate and then unnecessarily either required Pavlik to redo its designs or used CSY employees to redo the designs, forcing Plaintiff to incur additional, unnecessary costs.

63.    Plaintiff's damages associated with CSY's refusal to use the plans of Pavlik Design exceed $80,000.

64.    In addition, CSY requested that Plaintiff use Pavlik Design to reduce delay days. As a result of CSY's refusal to cooperate with Pavlik Design, Plaintiff has incurred $150,000 or more in delay penalties, which should be credited to Plaintiff.

/ / / / /

/ / / / /

Page 14   -    COMPLAINT

**(Range)**

65.     The Contract specifies that the Yacht's range shall be at least 4,000 miles at 10.0 knots.  In material breach of the Contract, the Yacht cannot support this range.

66.     Plaintiff's damages associated with Christensen's reduction in the Yacht's range are estimated to be $250,000.

**(Steel Sliding Doors)**

67.     In material breach of the Contract, CSY failed to timely complete its Contract due diligence of subcontractor Aritex Products, which has led to numerous defects in the steel sliding doors that were going to be installed in the Yacht.  Although another subcontractor replaced Aritex and constructed new doors, CSY's failure to appropriately investigate Aritex caused significant delays in the completion and delivery of the Yacht.

68.     Plaintiff's damages associated with the defective steel sliding doors are estimated to be $5,000.

**(Design of Bow Area)**

69.     In material breach of the Contract, CSY defectively designed the Yacht's bow area, resulting in insufficient space for wave-runner cradles.

70.     The problems created by CSY's defective bow design have resulted in the wave runners being higher than agreed to and thus presenting an aesthetic problem; potential risk to the Yacht, crew, and passengers should the wave runners become dislodged as a result of wind resistance and water over the bow; and encroachment of the cradles into the entertainment space on the Yacht's flybridge.

71.     Plaintiff's damages associated with the defective bow design exceed $20,000.

Portlnd3-1602263.1 0038448-00001

**("Walkaround" Design and Construction)**

72.     In material breach of the Contract, CSY designed and constructed the "walkaround," the Jacuzzi, and the stairs to the sun bed in a deficient and potentially unsafe way. The area is cramped, and the stairs are only 20 inches wide with a 42-inch drop.

73.     If CSY had planned the construction project properly, the stairs could have been made wider for a nominal cost.  Plaintiff brought the potential problem to CSY's attention during the initial stages of the project, but CSY refused to install the safer, wider stairs and instead retrofitted an unsightly safety rail.

74.     Plaintiff's damages associated with the stair defect exceed $25,000.

**(Teak Sky Lounge Flooring)**

75.     In material breach of the Contract, CSY failed to use engineering drawings that were provided by Pavlik Design for the design of the Yacht's teak sky lounge flooring. Although CSY had possession of the drawings for nearly one year, it failed to plan the project and instead served a last-minute work order on Plaintiff for this item.

76.     Even though any resulting delay was caused by CSY's year-long failure to review the drawings and properly plan for the floor construction, a work order for the teak floors improperly included a charge to Plaintiff for substantial delay penalties.

77.     When Plaintiff refused to sign the work order, Plaintiff was forced to contract directly with the subcontractor, Teak Decking.  As a result of the delay created by CSY, Teak Decking had moved on to other projects, requiring Plaintiff to convince Teak Decking to complete the job at a higher cost.

78.     Plaintiff's damages associated with the flooring problem exceed $15,000.

Page 16  -    COMPLAINT

**(Medicine Cabinets)**

79.     In material breach of the Contract, CSY failed to use engineering drawings that were provided by Pavlik Design for the design and installation of the Yacht's medicine cabinets. CSY had the drawings for nearly one year.

80.     Because of CSY's failure to follow the engineering drawings, the installation of the medicine cabinets was problematic.  Plaintiff was forced to build the cabinets itself, outside of CSY.  Thus, Plaintiff incurred more costs than it would have had CSY properly planned the project.

81.     Plaintiff's damages associated with the installation of the medicine cabinets exceed $10,000.

**(Marble Acquisition and Installation)**

82.     In material breach of the Contract, CSY refused to allow Plaintiff to use its preferred contractor, Homchick Stoneworks ("Homchick"), for the marble acquisition and installation on the Yacht, despite CSY's collaboration with Homchick and CSY's use of Homchick for its own spec boats.  Instead, CSY insisted that Carranza Marble & Granite ("Carranza"), a friend of CSY employee Robert Emerson, be retained to handle the marble work.

83.     There have been numerous problems with Carranza's work, resulting in delays and the potential for CSY to impose delay penalties upon Plaintiff.  In addition, Carranza represented that it was under-funded, and it made sudden demands for immediate payment from Plaintiff's designer.  When Plaintiff's designer was not able to provide payment within Carranza's unreasonable timetable, Carranza refused to work, causing Plaintiff to incur additional delay penalties.

Portlnd3-1602263.1 0038448-00001

84.    Plaintiff's damages associated with the acquisition and installation of marble exceed $140,000.

**(Teak Boat Deck Walkways)**

85.    The Contract provides that $46,325 was allocated for the installation of teak boat deck walkways.

86.    No teak deck boat walkways were installed.

87.    Because the teak deck boat walkways were not installed, Plaintiff should not have been charged for them.  Plaintiff received a partial credit of $8,760 from CSY, but CSY still owes Plaintiff $37,565.

**(Wall Wood, Base Wood, Crown Molding, and Cabinetry)**

88.    As described in paragraphs 1 through 51, CSY made numerous misrepresentations regarding the cost and installation of the Yacht's wall wood, base wood, crown molding, and cabinetry.

89.    Plaintiff's damages associated with the wood and cabinetry problems exceed $2 million.

**(Lower Level Seating)**

90.    In material breach of the Contract, CSY defectively installed the Yacht's lower level seating.  That seating now rests at the edge of an overhang, resulting in the seat being exposed to dripping water or excessive sun, depending on the weather conditions.

91.    Plaintiff's damages associated with the lower level seating are estimated to be $75,000.

/ / / / /

/ / / / /

Portlnd3-1602263.1 0038448-00001

**(Delta T System)**

92.     In material breach of the Contract, CSY did not properly install a Delta T ventilation system for removal of salt from air pumped into the Yacht's engine room.

93.     CSY represented to Plaintiff that it had installed a Delta T System in the Yacht, when in reality it was not a complete Delta T system.

94.     Plaintiff's surveyor discovered that the system installed in the Yacht was not a complete Delta T system.

95.     After this defect was revealed, Delta T required CSY to install a system with wide vents ten times larger than they should be (and different from the design specified in the Contract), causing a substantial aesthetic problem with the Yacht and reducing the usable entertainment space on the bridge aft deck.

96.     Plaintiff's damages associated with the air filtration system are estimated to be $100,000.

**(Draft)**

97.     In material breach of the Contract, which calls for a 7'4" draft, the boat was constructed with an 8'4" draft.

98.     This extra foot of draft eliminates Plaintiff's ability to dock the boat at his home, and it will prevent Plaintiff from cruising the shallow water of the Bahamas.

99.     Plaintiff's damages associated with the additional draft are estimated to be $1 million.

**(Ice Maker)**

100.     In material breach of the Contract, CSY ordered the wrong ice maker for the Yacht.  A second, correct, ice maker had to be ordered.

Page 19  -   COMPLAINT

101.     Although the ordering error was CSY's, CSY charged Plaintiff for both the correct and incorrect icemaker.

102.     Plaintiff's damages associated with the ice maker are estimated to be $1,500.

### (China and Glass Storage)

103.     In material breach of the Contract, CSY made the unilateral decision to install and charge Plaintiff for Lucite china and glass storage holders.

104.     CSY charged Plaintiff $10,000 for materials and the Lucite china and glass storage holders, including for their installation.

105.     Plaintiff's damages associated with the Lucite china and glass storage holders are estimated to be $20,000.

### (Dive Compressor Condensation Drain)

106.     In material breach of the Contract, CSY charged Plaintiff to install a drain in the dive compressor unit, even though the drain should have been included in the base contract price for the dive compressor unit.

107.     Plaintiff's damages associated with the dive compressor condensation drain are estimated to be $1,457.

### (Aft Boat Deck Teak Feature)

108.     In material breach of the Contract, CSY charged Plaintiff to install a teak feature on the aft boat deck, which CSY had represented would be included in the base contract price.

109.     Plaintiff's damages associated with the aft boat deck teak feature are estimated to be $1,780.

/ / / / /

/ / / / /

Page 20   -   COMPLAINT

**(Ship's Bell)**

110.    In material breach of the Contract, the ship's bell included in the Contract specifications for the Yacht was not installed by CSY.  CSY instead ordered a second, more expensive, bell.

111.    Although any error in ordering the bell was CSY's, CSY charged Plaintiff for the second, more expensive, bell, and CSY required Plaintiff to mount, install, and engrave the bell itself.

112.    Plaintiff's damages associated with the ship's bell are estimated to be $2,500.

**(Exterior Seating)**

113.    In material breach of the Contract, CSY incorrectly installed exterior seating with 24 inches of usable seat.

114.    The Contract provided that CSY would install exterior seating with 30 inches of usable seat.

115.    Plaintiff's damages associated with the exterior seating are estimated to be $100,000.

**(Cabinetry Rework)**

116.    CSY agreed to install patterned wood veneer on the Yacht's cabinets.

117.    In material breach of the Contract, CSY instead installed plain veneer.

118.    When Plaintiff objected to the plain veneer, CSY charged Plaintiff to have the wood retoned and refinished.

119.    Plaintiff's damages associated with the cabinetry rework are estimated to be $75,000.

Page 21   -   COMPLAINT

**(Galley Range Hood Overcharge)**

120.    Plaintiff agreed to pay $4,600 to have a galley range hood installed in the Yacht's galley.  In material breach of the Contract, CSY charged Plaintiff approximately $40,000 for installation.

121.    Plaintiff's damages associated with the galley range hood are estimated to be $35,000.

**(Garage Door)**

122.    In material breach of the Contract, the Yacht's garage door has been designed defectively and without proper safety features.

123.    Plaintiff's damages associated with the garage door are not known at this time.

**(Generator Break-in Period)**

124.    In material breach of the Contract, the Yacht's generators were broken in improperly.  This has caused excessive smoking and can cause internal damage to the Yacht.

125.    Plaintiff's damages related to the generator break-in period are unknown at this time.

**(Steering Failure)**

126.    On October 9, 2007, shortly before the Yacht was delivered to Plaintiff, the Yacht's main steering failed.

127.    Plaintiff's damages associated with the steering failure are unknown at this time.

**(Delay Damages)**

128.    Under the Contract, CSY is obligated to pay Plaintiff $5,000 for each of the first 31 days of delay and $7,500 for each day of delay thereafter.

Page 22  -    COMPLAINT

129.    All of the foregoing issues have resulted in substantial delays in CSY's completion and delivery of the Yacht to Plaintiff in accordance with the Contract.

130.    Most of the delays beyond August 31, 2006 are the full responsibility and fault of CSY.

131.    The total amount currently due Plaintiff in delay damages is approximately $2,950,000.

132.    On June 19, 2007, Plaintiff demanded in writing that CSY cure its material breaches of the Contract within 30 days.  A genuine copy of this letter is attached hereto as Exhibit 6.

133.    CSY remains in material breach of the Contract and has refused in writing to cure or otherwise remedy the existing defaults under the Contract.

134.    All conditions precedent to the maintenance of this action have been performed, satisfied, or otherwise discharged.

## FIRST CLAIM FOR RELIEF

### (Fraudulent Inducement—Against CSY)

135.    This is a claim by Plaintiff against CSY for fraudulent inducement.

136.    Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 through 53, above.

137.    CSY knowingly misrepresented, as alleged in detail above, facts involving:

a.    The charges that would be imposed on Plaintiff for wall wood, base wood, crown molding, and cabinetry in Hull 30;

/ / / / /

/ / / / /

Page 23   -    COMPLAINT

b.    The relative cost of the wall wood, base wood, crown molding, and cabinetry in comparison to the amounts paid by the purchasers of Hull 24 and Hull 26 for such items;

c.    The amount of hours that would be sufficient to complete Hull 30's décor;

d.    The date on which Hull 30 would be completed and delivered to Plaintiff; and

e.    CSY's agreement to provide detailed drawings, plans, renderings, and specifications for Hull 30.

138.    These representations were knowingly false to CSY at the time they were made, and they were made by CSY with no intention to perform at the time they were made.

139.    CSY made these material misrepresentations for the purpose of inducing Plaintiff to act in reliance thereon in purchasing the Yacht; entering into the Contract, Amendment, and other construction documents; and otherwise doing business with CSY.

140.    Plaintiff was ignorant of the falsity of CSY's representations.

141.    Plaintiff reasonably relied on CSY's false representations when it decided to purchase the Yacht; enter into the Contract, Amendment, and other construction documents; and otherwise do business with CSY.

142.    CSY's false statements and fraudulent inducement of Plaintiff were intentional.

143.    As a direct and proximate result of CSY's false statements, Plaintiff has suffered substantial damages in excess of $5 million, to be proved at trial.

144.    CSY's acts were intentional, wanton, willful, and in conscious disregard of Plaintiff's rights, entitling Plaintiff to the recovery of punitive damages according to proof at trial.

Page 24  -  COMPLAINT

## SECOND CLAIM FOR RELIEF

### (Negligent Misrepresentation—Against CSY)

145.    This is a claim by Plaintiff against CSY for negligent misrepresentation.

146.    Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 through 53, above.

147.    CSY misrepresented, as alleged in detail above, facts involving:

    a.    The charges that would be imposed on Plaintiff for wall wood, base wood, crown molding, and cabinetry in Hull 30;

    b.    The relative cost of the wall wood, base wood, crown molding, and cabinetry in comparison to the amounts paid by the purchasers of Hull 24 and Hull 26 for such items;

    c.    The amount of hours that would be sufficient to complete Hull 30's décor;

    d.    The date on which Hull 30 would be completed and delivered to Plaintiff; and

    e.    CSY's agreement to provide detailed drawings, plans, renderings, and specifications for Hull 30.

148.    CSY knew or should have known that its representations were false and that CSY had no intent to perform when made, or CSY had reckless disregard for the truth of its representations.

149.    CSY made these material misrepresentations for the purpose of inducing Plaintiff to act in reliance thereon in purchasing the Yacht; entering into the Contract, Amendment, and other construction documents; and otherwise doing business with CSY.

150.    Plaintiff was ignorant of the falsity of CSY's representations.

Page 25  -  COMPLAINT

151.    Plaintiff reasonably relied on CSY's false representations when it decided to purchase the Yacht; enter into the Contract, Amendment, and other construction documents; and otherwise do business with CSY.

152.    CSY's misrepresentations were grossly negligent.

153.    As a direct and proximate result of CSY's false statements, Plaintiff has suffered substantial damages in excess of $5 million, to be proved at trial.

## THIRD CLAIM FOR RELIEF

**(Washington Consumer Protection Act, Wash Rev Code § 19.86.020—Against CSY)**

154.    This is a claim by Plaintiff against CSY for violating the Washington Consumer Protection Act, Wash Rev Code § 19.86.020.

155.    Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 through 53, above.

156.    CSY's misrepresentation of facts involving:

a.    The charges that would be imposed on Plaintiff for wall wood, base wood, crown molding, and cabinetry in Hull 30;

b.    The relative cost of the wall wood, base wood, crown molding, and cabinetry in comparison to the amounts paid by the purchasers of Hull 24 and Hull 26 for such items;

c.    The amount of hours that would be sufficient to complete Hull 30's décor;

d.    The date on which Hull 30 would be completed and delivered to Plaintiff; and

e.    CSY's agreement to provide detailed drawings, plans, renderings, and specifications for Hull 30 constituted an unfair deceptive act or practice.

Page 26  -  COMPLAINT

157.    CSY's deception occurred in conduct of trade or commerce.

158.    CSY's deception has an impact on the public interest.

159.    CSY's deception injured Plaintiff's business and property.

160.    As a direct and proximate result of CSY's deception, Plaintiff has suffered substantial damages in excess of $5 million, to be proved at trial.

161.    Plaintiff is entitled to treble damages and to recover attorneys' fees and costs.

### FOURTH CLAIM FOR RELIEF

### (Breach of Contract—Against CSY)

162.    This is a claim by Plaintiff against CSY for breach of contract.

163.    Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 through 134, above.

164.    By its actions as alleged herein, CSY has materially breached the Contract.

165.    As a direct result of CSY's material breach of the Contract, Plaintiff has suffered damages in excess of in excess of $5 million, to be proved at trial.

166.    Plaintiff is entitled to recover attorneys' fees and costs.

### FIFTH CLAIM FOR RELIEF

### (Breach of the Covenant of Good Faith and Fair Dealing—Against CSY)

167.    This is a claim by Plaintiff against CSY for breach of the covenant of good faith and fair dealing.

168.    Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 through 134, above.

169.    By its actions as alleged herein, CSY failed to perform in good faith the obligations imposed upon it by the Contract.

Page 27   -   COMPLAINT

170.    By its actions as alleged herein, CSY prevented Plaintiff from obtaining the full benefit of performance of the Contract.

171.    As a direct result of CSY's material breach of the covenant of good faith and fair dealing, Plaintiff has suffered damages in excess of in excess of $5 million, to be proved at trial.

## SIXTH CLAIM FOR RELIEF

### (Breach of Guaranty—Against Christensen)

172.    This is a claim by Plaintiff against David Christensen for breach of Guaranty.

173.    Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 through 134 and 162 through 166, above.

174.    The breaches of Contract by CSY have caused Christensen to breach his personal Guaranty, pursuant to which he guaranteed, among other things, "the due, prompt and faithful performance of, and compliance with, all obligations, covenants, terms, conditions, warranties and undertakings of Builder contained in the Contract * * * in accordance with the respective terms thereof."

175.    The Guaranty is an "absolute, unconditional, present and continuing guaranty of payment, performance, and compliance."

176.    Christensen is responsible for "the full and punctual payment and performance" of all of CSY's obligations due to Plaintiff.

177.    Christensen is responsible for Plaintiff's attorneys' fees and costs.

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Judgment, 28 USC § 2201(a))

178.    Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 through 53 and 135 through 153, above

Page 28  -  COMPLAINT

179.    To the extent that the Amendment might apply to any of the claims alleged by Plaintiff herein, Plaintiff is entitled to a declaration that the Amendment is void and unenforceable because of CSY's fraudulent and/or negligent misrepresentations and because the Amendment is not supported by consideration.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

A.    Enter judgment in its favor in an amount to be proven at trial, but for an amount not less than $5 million;

B.    Award Plaintiff punitive damages in an amount to be proven at trial;

C.    Award Plaintiff incidental damages in an amount to be proven at trial, including, without limitation, all lost income based upon the inability to charter the Yacht and all amounts claimed by Christensen for "delay damages";

D.    Award Plaintiff treble damages under the Consumer Protection Act;

E.    Award Plaintiff attorneys' fees and costs;

F.    Award Plaintiff pre-judgment and post-judgment interest on all amounts;

G.    Award Plaintiff a declaration that the Amendment is void and unenforceable; and

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

Page 29  -    COMPLAINT

H.      Award Plaintiff such further relief as this Court deems just and proper.

DATED:  October 16, 2007.                    STOEL RIVES LLP


                                              /s/ Scott J. Kaplan
                                             SCOTT J. KAPLAN
                                             OSB NO. 913350
                                             Telephone:  (503) 224-3380

                                             and

                                             J. Douglas Baldridge
                                             Danielle R. Foley
                                             Meredith L. Boylan
                                             Venable LLP
                                             575 7th Street, NW
                                             Washington, DC  20004
                                             Telephone:  202-344-4703
                                             Facsimile:  202-344-8300
                                             jdbaldridge@venable.com
                                             drfoley@venable.com
                                             mlboylan@venable.com

                                             Attorneys for Plaintiff

Page 30  -   COMPLAINT