IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| YACH WEST, LTD., a Cayman Islands company, | ) ) ) | |
| Plaintiff, | ) ) | Civil Case No. 07-1547-KI |
| vs. | ) ) | OPINION AND ORDER |
| CHRISTENSEN SHIPYARDS, LTD., a Washington corporation; and DAVID H. CHRISTENSEN, | ) ) ) ) | |
| Defendants. | ) ) ) | |

Scott J. Kaplan
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, Oregon  97204

J. Douglas Baldridge
Venable LLP
575 7th Street, NW
Washington, D. C.  20004

Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

Daniel F. Knox
Noah Jarrett
James M. Finn
William J. Ohle
Schwabe, Williamson & Wyatt, P.C.
Pacwest Center
1211 SW 5th Avenue, Suite 1900
Portland, Oregon  97204

      Attorneys for Defendants


KING, Judge:

      This action arose over Charles West's purchase of a custom yacht, eventually named MY

PARTY GIRL, from defendant Christensen Shipyards, Ltd. ("CSY").  A dispute arose during

construction of the yacht concerning whether some of the woodwork decor was included in the

price of the base boat.  CSY delivered the yacht late and some of the workmanship was

unsatisfactory to West.  Plaintiff Yacht West, Ltd. brought this action alleging claims for fraud,

negligent misrepresentation, breach of contract, breach of the covenant of good faith and fair

dealing, a violation of the Washington Consumer Protection Act, and for breach of guaranty

against defendant David H. Christensen.  For the reasons below, Defendants Christensen

Shipyards, Ltd. and David H. Christensen's Motion for Partial Summary Judgment (#48) is

granted in part.  I dismiss part of the fraud claims, the claim for rescission of the contract

amendment, the negligent misrepresentation claims, the claims for punitive damages, and the

Washington Consumer Protection Act claim.


Page 2 - OPINION AND ORDER

## FACTS

CSY is a well-known builder of large yachts.  In 2003, CSY sold half of the company to a third party and changed the compensation structure of its sales representative, Wesley Dickman, to more of a commission-based pay structure.  Sales were down for CSY in 2003.

Charles West owned seven progressively larger boats from the late 1970s onward, ranging from a 26-foot Wellcraft up to a 108-foot Broward he bought in 1998.  Jim McConville was involved in each of West's boat purchases.  In early 2003, West began looking for a larger yacht and retained McConville to assist with the next purchase.  Joseph Foggia, President and Chief Operating Officer of CSY, does not believe that McConville has much experience with building large custom yachts, as opposed to brokering purchases of smaller boats or yachts already built.

West and McConville considered shipyards both domestically and overseas but decided to use CSY because it offered fiberglass hulls and was a domestic company so the dollar exchange rate was not an issue.  West also liked the new hull design, the quality of CSY boats, and the amount of time CSY stated it would need to build a boat.

McConville had never purchased a yacht for a client from CSY but had met some of the company's management over the years.  He thinks he has been aboard all of the CSY yachts built over the last seven to ten years and specifically remembers being aboard the MYSTIC, ATLANTICA, WEHR NUTS, LIQUIDITY, and BIG BAD JOHN.

During the selection and negotiation process for the build of West's new yacht, McConville met with Dickman.  According to McConville and West, Dickman repeatedly told them that all wall wood, base wood, crown molding, and cabinetry ("Disputed Woodwork") on

Page 3 - OPINION AND ORDER

the MYSTIC would be included in the base price.  Dickman also made this statement to

McConville and West when touring the MYSTIC.  During this tour of the MYSTIC, Dickman

called Foggia to clarify, and then told McConville and West that Foggia confirmed that the wood

was included in the base price.[1]

Negotiations were intense and the deal broke down more than once prior to reaching the

final agreement.  On April 21, 2004, Yacht West's predecessor, which was an entity controlled

by West, and CSY executed a contract ("Contract") for the construction and purchase of a 146

foot yacht, known as Hull 30.  Christensen signed a guaranty.  In addition to assistance from

McConville, West was represented by counsel during negotiation of the Contract.  In Exhibit C,

the Contract provides an estimate of $1.4 million for decor allowances which are not part of the

base price.  Ohle Decl. Ex. 1 at 47, 171.  The Contract states, "Unless otherwise notified in

writing by the Customer of a change request, the Builder will use its standard details throughout

the yacht, done to Mystic standard."  Id. at 128.

After West paid CSY the $1.585 million down payment, a dispute arose in July 2004 over

what Disputed Woodwork was included in the base price for the Hull 30.  At a meeting at the

shipyard, McConville, West, and some of his designers were told that the Disputed Woodwork

was not part of the base price.  McConville was shocked because this was contrary to all of

CSY's prior representations.  CSY employees relied on the specification to support their

position.  The group called Dickman, CSY's salesman who sold Hull 30, to get his opinion on

---

[1]  I note that Dickman remembers this conversation differently.  He states that Foggia told
him that the woodwork was not included in the base price.  Dickman claims to have relayed that
information to the Yacht West group.

the issue.  McConville states that Dickman remembered at first that wood was included but changed his story later in the conversation.

The Yacht West group left the meeting believing that they had been taken advantage of and thinking they would have to pay $270,000 for the Disputed Woodwork.  CSY employees had told the Yacht West group that the $270,000 was a deal in comparison to what the owners of Hulls 24 and 26 paid for wood.

CSY later revised the charge for the Disputed Woodwork to $654,000.  CSY told McConville that this was a cap on how much West would have to spend on the wood unless he made decor selections of items more expensive than the wood on MYSTIC.  The higher amount was consistent with what McConville was told the wood on Hulls 24 and 26 cost.

The parties executed an amendment to the Contract ("Contract Amendment" or "Amendment") on October 25, 2004.  West again was represented by counsel during this negotiation.  The Amendment tried to clarify what type of woodwork was part of the base boat price and what was in the Exhibit C allowances and thus not included in the base price.  The Amendment also clarified that Exhibit C allowances are guidelines which will vary based on Yacht West's selections.

According to Foggia of CSY, Hull 30 had slight vibrations when it was underway.  He stated that the vibrations were corrected in the months prior to delivery.

In June 2007, Khiem Nguyen of CSY and Matt Denis of Soundown, the company that built the exhaust system, exchanged a series of emails in which Nguyen asked for a list of shipyards and hull numbers that have had the exhaust systems successfully installed and in operation.  Denis replied and stated briefly that he would leave out the ones that went bad.  A

month later, when Nguyen apparently had not received a list, he wrote back and asked Denis if he could send the "'successful' list" by the next day.  Foley Decl. Ex. 38 at 1.

Yacht West took delivery of Hull 30 in October 2007 under a Reservation of Rights Agreement.  The final cost of the Disputed Woodwork was over $1.9 million.

CSY represented itself as a world-class yacht builder with the experience and capability to deliver the custom features West sought by August 2006.  CSY stated that it had an engineering department and a naval architect on its staff.

No one at CSY told McConville that CSY's staff had no experience with the new features that would be implemented on Hull 30, including the tender garage, the particular Caterpillar engine, a vertical pilothouse windshield, and zero speed stabilizers.

No one told McConville that CSY would use an infusion technique on Hull 30 or informed him of the possible ramifications the technique could have on the weight of the yacht.

McConville did not know that when CSY engaged J&A Enterprises to evaluate the vibrations problems on Hull 30, CSY had J&A draft a short version of the report for disclosure to West.  The full version, which was not disclosed prior to this litigation, includes a number of findings about the vibration.

Yacht West raised concerns about the Soundown's exhaust systems installed on Hull 30. McConville did not learn until this litigation that CSY only disclosed successful Soundown projects and concealed problematic installations when questioned about the concerns.

McConville did not learn until this litigation that CSY had agreed with ABS that Hull 30 would undergo annual inspections related to its bottom panels because ABS found that the panels were deficient.

Page 6 - OPINION AND ORDER

If McConville had been informed of any of these issues, he would have investigated further before recommending to West that he buy the yacht or take delivery.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION[2]

### I.    Fraud Claims

Defendants move for summary judgment against the fraud claims Yacht West alleges. Defendants generally argue that Yacht West is trying to bootstrap fraud claims out of what are allegations for breach of contract, at most.

#### A.    Claim One–Disputed Woodwork

Yacht West alleges that it was fraudulently induced to enter into the Contract to buy the yacht and the later Contract Amendment. Yacht West relies on the following misrepresentations: (1) the charges that would be imposed for the Disputed Woodwork in Hull 30; (2) the relative

---

[2]  The parties contractually agreed that Washington law applies to the dispute and venue lies in this court.

cost of the Disputed Woodwork in comparison to the amounts paid by the buyers of Hull 24 and

Hull 26 for such items; (3) the amount of hours that would be sufficient to complete Hull 30's

decor; (4) the date on which Hull 30 would be completed and delivered; (5) the agreement to

provide detailed drawings, plans, renderings, and specifications for Hull 30; and (6) CSY's

experience with the construction techniques, features, and equipment used on Hull 30.

Defendants contend that the fraud claims fail because the alleged misrepresentations

concern future performance under the contract and not existing facts. They maintain that there is

no evidence to support Yacht West's contention that defendants did not intend to perform the

future promises at the time they were made. Defendants do agree that the allegations concerning

CSY's experience concern present facts but defendants contend that none of the statements of

experience are materially false. Defendants argue that some of the other alleged

misrepresentations are not actionable because they are statements of opinion rather than fact.

According to defendants, Washington courts only reluctantly set aside agreements to settle prior

disputes, such as the Contract Amendment. Thus, defendants argue that Yacht West did not

reasonably rely on anything addressed in the Contract Amendment.

Yacht West argues that the statements are either of present fact or, if about future

performance, were made with the intent to deceive and without any intention of performing at the

time the statements were made or, at a minimum, were made without care or concern if the

promises would be kept. Yacht West claims that CSY and Dickman were under considerable

financial pressure to close the deal. According to Yacht West, CSY's misrepresentations which

are statements of opinion are actionable because CSY has superior specialized knowledge of the

subject matter and thus falls within the exception to the general rule, especially concerning

amounts paid by other customers.  Yacht West also contends that CSY had an obligation to make all disclosures necessary to prevent a partial or ambiguous statement of fact from being misleading, even without a fiduciary duty to disclose.

A fraud claim must be based on the misrepresentation of an existing fact.  Shook v. Scott, 353 P.2d 431, 433 (Wash. 1960) (a statement that there would be adequate water for irrigation purposes was not actionable in fraud).  "A representation of an existing fact must exist independently of (1) any future acts or actions on the part of the party making the statement; (2) the occurrence of any other particular event in the future; and (3) the particular future uses of the person to whom the statement is made."  Westby v. Gorsuch, 50 P.3d 284, 291 (Wash. App. 2002) (an opinion on the current value of an antique is an existing fact, as opposed to the potential future market value).  In particular, the promise of future performance is not the representation of an existing fact.  West Coast, Inc. v. Snohomish County, 48 P.3d 997, 1000 (Wash. App. 2002) (county employee's promise that the county would not automatically impose a development moratorium on a particular wetlands being considered for purchase is a promise of future performance by the county and is not actionable).

The Contract is structured to account for the fact that West did not choose all materials and equipment prior to finalizing the Contract.  Instead, $2,250,000 in allowances were inserted with estimates of typical charges.  The allowances cover navigation/security/satellite communication, entertainment system, decor, small boats and motors, deck equipment, canvas, owners MCA outfitting, appliances, and decorative plumbing.  The following alleged misrepresentations are promises of future action concerning the decor allowance:  (1) the charges that would be imposed for the Disputed Woodwork in Hull 30; (2) the relative cost of the

Disputed Woodwork in comparison to the amounts paid by the buyers of Hull 24 and Hull 26 for such items; and (3) the amount of hours that would be sufficient to complete Hull 30's decor. All of these depend on how Hull 30 would be trimmed out, based on West's selections which were not made at the time the Contract was executed.

Plaintiff argues that the future promises fall within the exception for promises made with no concern on whether they will be kept. A promise made with the intent to deceive and no intent to perform is actionable as fraud. Similarly, a promise made "without care or concern whether it will be kept," and the promisor knows or should know that the promisee will be induced to act, is actionable as fraud. Markov v. ABC Transfer & Storage Co., 457 P.2d 535, 539 (Wash. 1969) (breach of promise to renew lease in four months was actionable as fraud based on lessor's secret negotiations with an undisclosed third party for a sale of the leased premises). Plaintiff relies on evidence that McConville's pay structure had been changed from a salary to a commission and CSY had not sold a yacht in a year. This is not enough to raise a factual issue that CSY did not care if it kept the promises about the Disputed Woodwork. Many, many sales people work on a full commission basis. That does not convert all of their company's unkept promises into fraud.

The next two alleged fraudulent statements are the date on which Hull 30 would be completed and delivered and the agreement to provide detailed drawings, plans, renderings, and specifications for Hull 30. Again, both of these are not existing facts. Instead, they are promises of future performance.

The final alleged fraudulent statement in Claim One concerns CSY's experience with the construction techniques, features, and equipment used on Hull 30. CSY represented itself as a

world-class yacht builder with the experience and capability to deliver the custom features West

sought by August 2006.  CSY also stated that it had an engineering department and a naval

architect on its staff.

There is no evidence that CSY does not have an engineering department and a naval

architect on staff.  The statements CSY made about its experience are very general in nature.

There is no evidence that CSY made specific representations, such as it had built three yachts

with the particular tender garage, Caterpillar engine, vertical pilothouse windshield, or zero speed

stabilizers.  More precise statements could be actionable as fraud.  General statements about

being a world-class yacht builder with the experience to build the desired yacht are too general in

nature to support a fraud claim.  They are more in the nature of puffery which is expected as part

of a sales transaction and is not actionable as fraud.  See Baughn v. Honda Motor Company, Ltd.,

727 P.2d 655, 668 (Wash. 1986) ("loose general praise of goods sold," known as sales talk or

puffing, is not actionable for fraud).

Accordingly, I grant summary judgment and dismiss the fraud claim alleged in Claim

One.

B.    Claims Four and Six–Exhaust System

In Claim Four, Yacht West alleges that CSY fraudulently misrepresented that the

Soundown exhaust system was proven, of high quality, free of material defects, and that all of

Soundown's prior projects had been successful.

In Claim Six, Yacht West alleges that CSY failed to disclose material facts about

Hull 30's exhaust system.

Defendants contend that the alleged misrepresentations are not actionable as fraud because they are statements of opinion. Yacht West disagrees, maintaining that the statements are of fact and are actionable because CSY had superior knowledge and withheld adverse material information.

The statements that the exhaust system was proven, of high quality, and free of material defects are more examples of puffery and are not actionable as fraud. There is evidence, however, that as of June 2007, prior to West taking delivery of Hull 30, CSY knew that there were unsuccessful Soundown installations. The knowledge came from the email exchange between Khiem Nguyen of CSY and Matt Denis of Soundown in which Denis stated that he would leave the installations that went bad off the list. I do not see this as a duty to disclose issue, as discussed in Van Dinter v. Orr, 138 P.3d 608, 610 (Wash. 2006) (discussing when the duty to disclose arises), because CSY was allegedly responding to particular concerns over the exhaust system raised by plaintiff's representative, Eric Shear. First Amended Complaint ¶ 57.

I conclude that plaintiff has raised a factual issue requiring trial of the portions of Claims Four and Six alleging that CSY fraudulently misrepresented that all of Soundown's prior projects had been successful and the related failure to disclose.

C.    Claims Five and Seven–Vibration

In Claim Five, Yacht West alleges that when CSY turned over the shorter J&A report, it fraudulently misrepresented that Hull 30 did not have a vibration problem. Yacht West further alleges that CSY intentionally concealed the complete September 25, 2007 J&A report, which discusses possible reasons for the vibration, and the Milburn email.

Page 12 - OPINION AND ORDER

In Claim Seven, Yacht West alleges that CSY fraudulently failed to disclose material facts concerning Hull 30's vibration problem.

Defendants contend that the alleged misrepresentations are not actionable as fraud because they are statements of opinion. Yacht West argues that when CSY made this statement, it knew that the yacht had a vibration problem CSY had never experienced, causing CSY to retain a consultant to run tests.

A statement on whether or not a yacht has a vibration problem would often be a statement of opinion but CSY's possession of the complete J&A report at the time it made the statement changes the nature of the remark.

Defendants claim that CSY was under no duty to provide the full J&A report to Yacht West because the parties were negotiating the acceptance of the vessel with a full reservation of rights. Yacht West argues that these facts mandate a full disclosure of the J&A report because the shortened version of the report was misleading. I am unpersuaded by CSY's argument, particularly because CSY allegedly had a short version of the report compiled to convey to plaintiff.

I conclude that plaintiff has raised a factual issue requiring trial of Claims Five and Seven.

D.    Claim Thirteen

Yacht West alleges a claim for a declaratory judgment that the Contract Amendment is void and unenforceable because of CSY's fraudulent and/or negligent misrepresentations and because the Contract Amendment is not supported by consideration.

Defendants argue that Yacht West had no right to rely on any statements that are inconsistent with the Contract Amendment. Defendants alternatively argue that claims of misrepresentations during the negotiation of a settlement are not actionable. Additionally, defendants claim that if the contract is ambiguous, as contended by Yacht West, both parties gave up their respective arguments under the alleged ambiguity in the Contract for the certainty the Contract Amendment provided. Thus, defendants argue that Yacht West's lack of consideration argument is inconsistent with its contention that the Contract is ambiguous.

Yacht West argues that the Contract Amendment does not excuse CSY's fraud because it lacks consideration. Yacht West claims that CSY only agreed in the Contract Amendment to do what it was already obligated to do under the Contract–provide the Disputed Woodwork in the base price.

The Amendment only concerns the Disputed Woodwork and attempts to provide more specifics, in a single paragraph, on what is included in the base price.

I am unpersuaded by the lack of consideration argument. There was a dispute large enough that the two parties entered into the Amendment. In doing so, each gave up going forward based on their prior positions. This is adequate consideration to support a contract amendment.

> The party seeking to have the contract voided based on misrepresentation has the burden of establishing that the party's manifestation of assent is induced by an assertion or representation not in accord with the facts; that the assertion is either fraudulent or material; and that the recipient is justified in relying on the assertion.

Brinkerhoff v. Campbell, 994 P.2d 911, 915 (Wash. App. 2000). Moreover, "in the context of a contentious adversarial relationship, reliance on misrepresentations or omissions is unreasonable

Page 14 - OPINION AND ORDER

as a matter of law between the parties negotiating a settlement agreement." <u>Kwiatkowski v. Drews</u>, 176 P.3d 510, 518 (Wash. App. 2008).

I dismissed the fraud claims concerning the Disputed Woodwork.  I am unaware of any other misrepresentations plaintiff contends fraudulently induced it to enter into the Amendment. Moreover, due to the fact that the parties were attempting to settle a dispute, plaintiff could  not reasonably rely on any statements concerning the issue at the heart of the dispute.

For these reasons, I grant summary judgment and dismiss Claim Thirteen for rescission.

II.    <u>Negligent Misrepresentation Claims Two, Eight, and Nine</u>

Yacht West alleges negligent misrepresentation claims that parallel its fraud claims.

Defendants argue that the negligent misrepresentation claims must be dismissed because Washington does not allow for the recovery of purely economic losses under a negligence theory in a vendor/vendee relationship.

Yacht West distinguishes the cases on which defendants rely because the cases concern misrepresentations related to existing defects, allowing the parties to allocate the risk of defects in the existing structures at the time they enter into contracts.  Because Yacht West was not negotiating to buy an existing yacht, CSY's alleged misrepresentations made it impossible for the parties to allocate the risk of the misrepresentations in a contract.  Thus, Yacht West contends that the court should not apply the economic loss rule.

> The economic loss rule marks the fundamental boundary between the law of contracts, which is designed to enforce expectations created by agreement, and the law of torts, which is designed to protect citizens and their property by imposing a duty of reasonable care on others.  The economic loss rule was developed to prevent disproportionate liability and allow parties to allocate risk by contract.

Page 15 - OPINION AND ORDER

Berschauer/Phillips Constr. Co. v. Seattle School Dist. No. 1, 881 P.2d 986, 989-90 (Wash. 1994) (internal citations omitted) (economic loss rule prohibits general contractor from recovering purely economic damages in tort from an architect, engineer, and inspector who were not in privity of contract with the general contractor). "The economic loss rule applies to hold parties to their contract remedies when a loss potentially implicates both tort and contract relief." Alejandre v. Bull, 153 P.3d 864, 868 (Wash. 2007) (economic loss rule prevented tort recovery when septic tank failed immediately after purchase of home). If the claimed loss is economic, and no exception applies to the economic loss rule, the parties are limited to contractual remedies. Id. at 869. "[A]lthough Washington recognizes a tort claim for negligent misrepresentation under the Restatement (Second) of Torts § 552 (1977), this claim is not available when the parties have contracted against potential economic liability." Id. at 870.

All losses here are economic–no personal injury or injury to other property occurred. A contract governed the transaction. Thus, the economic loss rule precludes the negligent misrepresentation claims.

Yacht West's policy argument is better made to the Washington Supreme Court. I must follow the law as it has been set out by that court. Accordingly, I grant summary judgment against the three negligent misrepresentation claims.

III.    Washington's Consumer Protection Act Claim

Yacht West alleges that CSY violated the Washington Consumer Protection Act ("WCPA"), WRC § 19.86.020, due to the same misrepresentations alleged in Claim One.

Defendants argue that the WCPA claim must be dismissed because it lacks two of the five elements required to establish a claim under the Act.

First, defendants contend that Yacht West cannot establish an unfair or deceptive act which had the capacity to deceive a substantial portion of the public because none of the statements at issue here were communicated to anyone other than between Yacht West and defendants. Yacht West contends that there is a factual issue on whether CSY's conduct was deceptive, thus making the issue something that cannot be decided by summary judgment. Because the next argument is dispositive, I decline to address this one.

Second, defendants argue that Yacht West cannot establish that the sale impacted the public interest. Yacht West claims that under Washington law, even essentially private disputes can impact the public interest under the WCPA.

The WPCA states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. The legislature enacted the WCPA "in order to protect the public and foster fair and honest competition." RCW 19.86.920. The WCPA "shall be liberally construed that its beneficial purposes may be served." Id. To establish a WCPA violation, a plaintiff must prove: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; and (5) causation. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 719 P.2d 531, 533 (Wash. 1986).

The third element is at issue here. If the alleged violation does not satisfy the public interest element per se, as noted in a legislative declaration of public interest, the analysis is based on several factors which depend on the context in which the alleged acts were committed, either a consumer transaction or a private dispute. Id. at 537-38. Hangman lists several cases concerning consumer transactions: purchase of defective wheat seed, purchase of defective

mobile home, purchase of new automobile with defective paint job, and purchase of defective

used automobile.  Id. at 537.  Hangman uses the following cases as examples of private disputes:

attorney-client, insurer-insured, realtor-property purchaser, and escrow closing agent-client.  Id.

at 538.

Defendants note that the yacht was custom built, had a base price of over $15 million,

was to be available for charter approximately half the time, and both parties were represented by

counsel throughout the negotiations.  This strikes me as more of a private dispute than a

consumer transaction due to the custom nature of the yacht.

> Ordinarily, a breach of a private contract affecting no one but the parties to the
> contract is not an act or practice affecting the public interest.  However, it is the
> likelihood that additional plaintiffs have been or will be injured in exactly the
> same fashion that changes a factual pattern from a private dispute to one that
> affects the public interest.  Factors indicating public interest in this context
> include:  (1) Were the alleged acts committed in the course of defendant's
> business? (2) Did defendant advertise to the public in general? (3) Did defendant
> actively solicit this particular plaintiff, indicating potential solicitation of others?
> (4) Did plaintiff and defendant occupy unequal bargaining positions?

Id. (internal citation omitted).

There are no fact issues concerning these factors.  The conduct took place in the course of

CSY's business.  CSY advertises through brokers, magazines, and the Internet but there is no

evidence that CSY first approached West.  McConville, on behalf of West, was actively shopping

shipyards all over the world.  It is clear that CSY and West did not occupy unequal bargaining

positions.  West retained both McConville, a yacht broker in the boat business since 1985, and an

attorney to represent him.  The yacht was custom built according to detailed specifications and

cost well over $15 million.  West had purchased seven progressively larger boats, including a

108-foot Broward.  Thus, he was experienced himself in this type of purchase and had ample

assistance.  I do not see any evidence that additional yacht purchasers have been or will be injured in the same alleged fashion.  See Pacific Northwest Life Ins. Co. v. Turnbull, 754 P.2d 1262, 1269 (Wash. App. 1988) (public interest not affected under WCPA in purchase of real property for a commercial purpose because purchasers "had sufficient sophistication to remove them from the class of bargainers subject to exploitation").  West, the Chief Executive Officer of Pet Supermarket, Inc., with locations in numerous states, who was assisted by McConville and counsel, is likewise not a bargainer subject to exploitation.  He is an astute businessman.  Thus, I conclude as a matter of law that this is a private dispute which does not affect the public interest.  Accordingly, I grant summary judgment and dismiss the WCPA claim.

IV.    Punitive Damages

Defendants contend that under Washington law, Yacht West is not entitled to punitive damages sought in the common law fraud claims because no statute authorizes that relief.

The Washington Supreme Court disapproves of punitive damages as contrary to public policy because they impose a penalty usually reserved for criminal sanctions and award plaintiffs windfalls beyond normal compensation.  Punitive damages are prohibited without express legislative authorization.  Dailey v. North Coast Life Ins. Co., 919 P.2d 589, 590 (Wash. 1996).  Because the fraud claims are based on the common law, there is no legislative authorization for punitive damages.  I grant partial summary judgment and dismiss claims for punitive damages under the fraud claims.[3]

Because I dismissed the WCPA claim, I do not need to address defendants' argument concerning treble damages available under the Act.

_____

[3] I note that plaintiff conceded defendants' motion at oral argument.

V.     Time Limitation on Breach of Contract Claim

Yacht West alleges claims for breach of contract and breach of the covenant of good faith and fair dealing.

Defendants argue that the parol evidence rule bars a claim for the breach of any promises made prior to the execution of the Contract.  Defendants specifically argue that the alleged oral representations about what is or is not included in the base price versus the allowances is irrelevant and inadmissible in light of the written provisions in the Contract on the topic and the Contract's integration clause.

Yacht West contends that boilerplate integration clauses do not apply in cases of fraud and negligent misrepresentation.

The Contract states:  "18.17  Entire Agreement.  This Agreement sets forth the entire agreement and understanding between the parties and supersedes all prior representations, undertakings, plans, and agreements between the parties."  Ohle Decl. Ex. 1 at 19.

> However, the parol evidence rule only applies to a writing intended by the parties as an "integration of their agreement; i.e., a writing intended as a final expression of the terms of the agreement.  In making this preliminary determination of whether the parties intended the written document to be an integration of their agreement, which is a question of fact, the trial court must hear all relevant, extrinsic evidence, oral or written.  If, after hearing all the evidence, the court determines that the writing is the final and complete expression of the parties' agreement–i.e., completely integrated–then the extrinsic evidence is disregarded.  If, however, the court finds that the parties intended the writing to be a final expression of the terms it contains but not a complete expression of all terms agreed upon–i.e., partially integrated–then the terms not included in the writing may be proved by extrinsic evidence only insofar as they are not inconsistent with the written terms.

Emrich v. Connell, 716 P.2d 863, 866-67 (Wash. 1986) (internal citation and emphasis omitted).

It is not possible for me to determine as a matter of law whether the Contract was completely or partially integrated. Thus, I also cannot rule as a matter of law that the alleged oral representations are not part of the agreement.

I realize that the Contract had an integration clause but that is not dispositive of whether the Contract was completely integrated. Black v. Evergreen Land Developers, Inc., 450 P.2d 470, 475-76 (Wash. 1969) (not enforcing the integration clause in a deed after finding it to be false).

Accordingly, I deny defendants' motion to limit the breach of contract claim. I will make a determination of what evidence is admissible at trial based on motions in limine filed prior to the pretrial conference.

VI.    Consequential Damages

Yacht West seeks $2 million in consequential damages in lost charter income. Defendants move to dismiss Yacht West's prayer for consequential damages, relying on the Contract's express waiver of consequential damages:

> **12.2 Disclaimers. EXCEPT FOR THE FOREGOING WARRANTIES, THERE IS NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR ANY IMPLIED WARRANTY OF MERCHANTABILITY. BUILDER'S LIABILITY UNDER THE FOREGOING EXPRESS WARRANTIES SHALL BE LIMITED TO REPAIR OR REPLACEMENT OF MATERIALS OR WORKMANSHIP, WHICH DO NOT CONFORM TO CONSTRUCTION STANDARDS PER PARAGRAPH 2. BUILDER SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL DAMAGES. BUILDER SHALL NOT BE LIABLE FOR ANY INCIDENTAL DAMAGES EXCEPT FOR DOCKAGE FEES, MOORAGE FEES, DRY DOCK FEES, AND LIFTING FEES INVOLVED IN EFFECTING WARRANTY REPAIRS.**

Ohle Decl. Ex. 1 at 9, § 12.2.

Page 21 - OPINION AND ORDER

Yacht West argues that the provision excluding consequential damages is unenforceable because the limited remedy fails its essential purpose. Yacht West relies on the limitation of remedies for warranty issues to repair or replacement of materials or workmanship. It contends the essential purpose of the limited remedy provision is to fix problems encountered with the yacht after delivery, which it claims CSY has failed to do. Alternatively, Yacht West claims that the factual dispute, such as if there is a vibration problem and, if so, if the problem has been fixed, makes summary judgment on the consequential damages clause inappropriate for summary judgment. Alternatively, Yacht West claims that the prohibition of consequential damages is unconscionable because the entire relationship between the parties is tainted by CSY's repeated material misrepresentations.

Defendants argue that the claim for consequential damages is based on lost charter income, due to the delay in completing Hull 30, and does not relate to a failure to repair. Defendants argue that the Contract remedy for delay is liquidated damages, which are also sought by Yacht West.

The law on whether "the failure of a limited remedy vitiates the validity of a conscionable exclusionary clause" is a difficult labyrinth with the ultimate answer still undecided by the Washington Supreme Court. Am. Nursery Prod., Inc. v. Indian Wells Orchards, 797 P.2d 477, 484-85 (Wash. 1990) (not reaching the issue because the available remedies did not fail their essential purposes).

A.    Consumer or Commercial Transaction

Different analyses apply to consumer and commercial transactions. Thus, I will first decide which type of transaction best describes the deal between CSY and West.

> In consumer sales transactions, intervention is warranted to counteract the inherent inequality of bargaining power and the resultant inequities. Parties to a commercial contract, however, generally have equal bargaining power and an equal ability to seek advice and alternative offers. As a result, commercial contracts are less subject to the type of unfair surprise which may be found in consumer sales transactions. This being so, only those commercial transactions with sufficient indicia of unfair surprise in the negotiations should be subject to the <u>Berg</u> rule.

<u>Puget Sound Fin. v. Unisearch, Inc.</u>, 47 P.3d 940, 946 (Wash. 2002) (quoting <u>Am. Nursery Prods., Inc.</u>, 797 P.2d at 481)).

Here, both parties were represented by counsel throughout the negotiations and West was assisted by a yacht broker. Thus, they had an equal ability to seek advice and alternative offers. West had much more bargaining power than a typical consumer, particularly in light of the fact that he was negotiating a transaction worth over $15 million. Moreover, the yacht was to be available for charter approximately half the time and the consequential damages are based on the loss of charter income. Based on all the circumstances, I will consider the transaction a commercial one.

B.    <u>Unconscionability</u>

A liability limitation is not enforceable if it is unconscionable. The limitation is prima facie conscionable in a commercial transaction. Whether a liability limitation is unconscionable is decided as a matter of law. <u>Puget Sound</u>, 47 P.3d at 944-45 & n.12.

> The nonexclusive factors for assessing the totality of the circumstances include: (1) the conspicuousness of the clause in the agreement; (2) the presence or absence of negotiation regarding the clause; (3) the custom and usage of the trade; and (4) any policy developed between the parties during the course of dealing.

Id. at 945.  This test, known as the totality of the circumstances analysis, is applied in analyzing

commercial transactions if there is insufficient indicia of unfair surprise.  The court has

considered other factors:  "'(1) the manner in which the parties entered into the contract,

(2) whether the parties had a reasonable opportunity to understand the terms of the contract, and

(3) whether the important terms were hidden in a maze of fine print.'"  Puget Sound, 47 P.3d at

946 (quoting Am. Nursery Prods., Inc., 797 P.2d at 477)).

     If there is sufficient evidence of unfair surprise in a business transaction, the two-prong

consumer analysis in Berg v. Stromme, 484 P.2d 380 (Wash. 1971), is used instead of the totality

of the circumstances analysis.  Puget Sound, 47 P.3d at 945-46.

     Puget Sound notes that the concern for unfair surprise is "most commonly associated with

a maze of fine print in warranty disclaimers."  Id. at 946.  That is not the case here.  The Contract

was the result of intense negotiations that broke down several times.  Both sides were represented

by counsel.  As discussed below, the clause is conspicuously displayed in the Contract.  I

conclude that there is no indicia of unfair surprise.

     The next step is to determine if the limitation clause is unconscionable using the totality

of the circumstances analysis.

     The conspicuousness factor overlaps the factor on whether the terms were hidden in fine

print.  The clause excluding consequential damages is in all capital letters, in bold face, and takes

up about one-half page of a Contract that has 19 pages of general contract terms, ignoring the 177

pages of yacht specifications attached behind the general terms.  The only other paragraphs that

are in all bold face capital letters are two paragraphs concerning warranties and one paragraph

concerning the customer's obligation for insuring the yacht.  Another paragraph on the limitation

Page 24 - OPINION AND ORDER

of liability is in bold face but not all capital letters. In total, less than two pages of the 19 pages of general terms are in bold face type and only a little more than one page is in bold face capital letters. I find that the clause excluding consequential damages is conspicuous.

The presence or absence of negotiations factor overlaps with the manner in which the parties entered into the contract and whether they had a reasonable opportunity to understand the terms of the contract. As mentioned above, the parties were both represented by counsel. West also had a yacht broker assisting him. I do not know how long the negotiations took but they were described as intense and took long enough to break down a few times. There is no information on whether the clause excluding consequential damages was negotiated or proffered by one party and accepted without change. Even if there was no negotiation on this particular clause, West had the opportunity, with his counsel assisting, to understand the clause and seek changes.

There is no evidence of custom or trade usage concerning the exclusion of consequential damages in contracts to build large yachts. Finally, West and CSY did not have a course of dealing as this was the first transaction between them.

I am also unpersuaded by Yacht West's argument that the clause is unconscionable because the entire relationship between the parties is tainted by CSY's repeated material misrepresentations. There is no evidence that the alleged misrepresentations touched on the clause in any manner. The need for consequential damages could have been triggered by problems with the construction of the yacht caused by negligence rather than fraud. West is sophisticated and experienced enough to make a determination on how to allocate the risk.

Page 25 - OPINION AND ORDER

After considering the totality of the circumstances, I find that clause excluding

consequential damages is conscionable.

C.      Failure of Essential Purpose

The next issue is whether the clause is enforceable, which depends on whether it fails of

its essential purpose.  Am. Nursery Prods., Inc., 797 P.2d at 482-84 (because the available

remedies do not fail of their essential purposes, the exclusionary clause is enforceable and the

court does not have to reach the question of whether the failure of an exclusive or nonexclusive

limited remedy renders unenforceable a conscionable limitation of consequential damages).

The clause limits remedies exclusively to repair or replacement of materials or

workmanship which do not conform to construction standards, as well as limited incidental

damages for particular types of dock fees.

> [A]n exclusive limited remedy fails of its essential purpose when there are
> unreasonable delays in providing the remedy or the party required to provide the
> remedy is unable to do so.  An exclusive remedy has also been held to fail of its
> essential purpose when the party required to provide the remedy, by action or
> inaction, causes the remedy to fail or when defects in goods are not discoverable
> upon reasonable inspection.

Id. at 484 (internal citation omitted).

The parties dispute whether CSY has successfully repaired all of the alleged problems

with Hull 30.  CSY did not even move for summary judgment against the full breach of contract

claim.  It is not yet possible to determine if the exclusive repair or replace remedy has failed of its

essential purpose because it is not yet known if a full repair has been made or can be made.  Once

a jury decides that issue, the court will undertake the case-by-case analysis to give effect to the

parties' intentions regarding risk allocation, as discussed in Fiorito Bros., Inc. v. Fruehauf Corp.,

747 F.2d 1309 (9th Cir. 1984) (predicting how Washington courts would decide the issue), to make the final determination on whether the clause excluding consequential damages is enforceable.

Accordingly, I deny defendants' motion to dismiss Yacht West's prayer for consequential damages.

VII.    <u>Guaranty Claim</u>

In Claim Twelve, Yacht West alleges that Christensen breached the guaranty he executed personally. Defendants moved to dismiss any claims under Christensen's personal guaranty concerning vibration issues. At oral argument, defendants withdrew this part of the motion.

**CONCLUSION**

Defendants Christensen Shipyards, Ltd. and David H. Christensen's Motion for Partial Summary Judgment (#48) is granted in part as explained above.

IT IS SO ORDERED.

Dated this ____14th____ day of May, 2009.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge

Page 27 - OPINION AND ORDER