IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

YACHT WEST, LTD., a Cayman Islands        )
company,                                  )
                                          )
                    Plaintiff,            )        Civil Case No. 07-1547-KI
                                          )
            vs.                           )        OPINION AND ORDER
                                          )
CHRISTENSEN SHIPYARDS, LTD., a            )
Washington corporation; and DAVID H.      )
CHRISTENSEN,                              )
                                          )
                    Defendants.           )
                                          )

       Per A. Ramfjord
       Stoel Rives LLP
       900 SW Fifth Avenue, Suite 2600
       Portland, Oregon  97204

       J. Douglas Baldridge
       Venable LLP
       575 7th Street, NW
       Washington, D. C.  20004

            Attorneys for Plaintiff

Daniel F. Knox
Noah Jarrett
James M. Finn
William J. Ohle
Schwabe, Williamson & Wyatt, P.C.
Pacwest Center
1211 SW 5th Avenue, Suite 1900
Portland, Oregon  97204

       Attorneys for Defendants


KING, Judge:


This action arose over Charles West's purchase of a custom yacht from defendant

Christensen Shipyards, Ltd. ("CSY").  Both sides prevailed on some claims in a jury trial, with

the jury awarding Yacht West $2,000,000 for breach of contract as a result of a structural

problem, $2,600,000 for breach of contract concerning the exhaust system, $125,000 for breach

of contract concerning defective paint, and $34,625 for breach of contract concerning a defective

davit.  The jury awarded CSY $3,272,858 for breach of contract concerning construction and

delivery delays.  Before the court are both sides' renewed motions for judgment as a matter of

law.  For the reasons below, I grant both motions in part and reduce the amounts the jury

awarded each side.

## LEGAL STANDARDS

A motion for judgment as a matter of law must be denied, and a jury's verdict must be

upheld, if the verdict is supported by substantial evidence.  Wallace v. City of San Diego, 479

F.3d 616, 624 (9th Cir. 2007).  "Substantial evidence is evidence adequate to support the jury's

conclusion, even if it is possible to draw a contrary conclusion from the same evidence."  Id.

PAGE 2 - OPINION AND ORDER

The court must review the record as a whole but disregard all evidence favorable to the moving party that the jury is not required to believe.  All reasonable inferences must be drawn in favor of the nonmoving party.  Moreover, the court may not substitute its view of the evidence for the jury's, may not make credibility determinations, and may not weigh the evidence.  Id.; Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir.), cert. denied, 534 U.S. 1035 (2001).

## DISCUSSION

I.    CSY's Motions

CSY argues that Yacht West's evidence was insufficient to support the jury's award of damages for the structural and exhaust system problems.  CSY characterizes the evidence on these issues as speculation and conjecture and asks the court to set aside damages the jury awarded on these two claims.

Yacht West contends that under Washington law, uncertainty on the amount of damage does not prevent recovery as long as there is no uncertainty about the fact of the damage.  Yacht West claims that the fact of damage was proven by testimony from both expert witnesses and fact witnesses familiar with the yacht.

The first issue is whether I apply Washington or federal law when reviewing the sufficiency of the evidence.

Yacht West argues that the following Washington law governs the issue:

> Damages must be supported by competent evidence, but a party who has established the fact of damage will not be denied recovery on the basis that the amount of damage cannot be exactly ascertained.  Evidence is sufficient if it affords a reasonable basis for estimating the loss and does not subject the trier of fact to speculation and conjecture.

PAGE 3 - OPINION AND ORDER

Transpac Dev., Inc. v. Oh, 130 P.3d 892, 896-97 (Wash. Ct. App. 2006).  See also Gaasland Co.,

Inc. v. Hyak Lumber & Millwork, Inc., 257 P.2d 784, 788 (Wash. 1953) ("the doctrine

respecting the matter of certainty, properly applied, is concerned more with the *fact of damage*

*than with the extent or amount of damage*").

I find that CSY correctly contends that federal law applies.  Freund v. Nycomed

Amersham, 347 F.3d 752, 762 (9th Cir. 2003) (appropriate standards of review to be applied by

a federal court sitting in diversity are questions of federal law).  Thus, I will apply the substantial

evidence standard set forth above.

A.    Structural Problem

The jury awarded Yacht West $2 million for breach of contract as a result of a structural

problem which caused a vibration or excess weight.

CSY claims that Yacht West's witnesses stated that they did not know how to correct the

structural problem.  Thus, CSY contends that the expert did not properly support his testimony

that the repair would require $4 million because Yacht West does not know what the repair

would entail.  According to CSY, expert Kirilloff's comparison of the yacht with other vessels

did not connect any alleged diminished value with a vibration or excess weight.  CSY claims that

Kirilloff did not explain how buyers would value the yacht, its custom features, or its defects.

Instead, CSY claims Kirilloff tied his opinion on the diminution in value of the yacht to the cost

of repairs, which CSY argues are unknown because the repair itself is unknown.  Finally, CSY

notes that there is testimony on neither the diminution in value of the yacht due to the excess

weight nor the cost to reduce the weight.

PAGE 4 - OPINION AND ORDER

Yacht West claims that the fact of damage is proven due to the excess weight of the yacht at delivery, in addition to testimony establishing the excess vibration.  This argument standing alone, however, is not adequate to meet CSY's arguments.  There must be substantial evidence to support the verdict on the amount of damages.

Yacht West's expert Richard Merhige testified that the yacht had a structural deficiency causing a hull-springing vibration but that he would have to perform further testing to determine how to correct the problem.

Yacht West's expert Boris Kirilloff, a naval architect, has been involved in four exhaust relocations, including moving a side exhaust to an aft exhaust.  In addition to his experience building, restoring, and converting boats, some of which were much larger than the yacht at issue here, he has about 25 years of experience performing valuation surveys of boats for institutions such as banks and insurance companies.  Kirilloff relied on Merhige's opinion about the vibration, specifically, Kirilloff accepted Merhige's opinion that:  (1) he does not know what is causing the vibration; and (2) the vibration cannot be fixed without determining the cause.

Kirilloff testified that the yacht had a diminished value of at least $4 million, apart from the cost to reroute the exhaust.  He explained his opinion as follows:

Q.    Can you explain in detail what you did to arrive at that diminished value?

A.    Well, as a custom boat, you have to find custom features in other boats that you know about and then try to identify the – the various features that would not be able to be enjoyed by the owner.  And the perception of the buyer is everything.

So, in this case, I said that it's – there would be a certain cost associated with fixing the boat to make the boat correct.  And whether or not Mr. West would refund that or reduce the price of the boat by that amount of money or that the new buyer would have to spend that much to get the boat in the right technical sense, that would be the first way of diminishing the value of the vessel.  That

would include the loss of the use of the boat, the time that it would take to get the boat repaired, and comparing that to other vessels of this size that have no flaws.

Q.      Now, you mentioned "make the boat correct."  What are you speaking of when you say that?

A.      Well, we know that – we know that we need to bring the exhaust aft.  It's a much more acceptable configuration for yachts of this size.  We know that there are deficient hull panels, because there are hull panels noted in the ABS technical files that say that certain things have to be done to bring them up to speed.  So we have to investigate whether they were done or not and then plan on fixing that.

        We know we've got a vibration, which we have to do some further investigation into.  And to do that investigation would take a very substantial effort on behalf of whoever is doing the work, to find out why the boat is vibrating the way that it is.

Q.      What did you do specifically to determine the market value – values you were working with?

A.      Well, we're – we're retained often by buyers and sellers of boats to determine market values of their yachts.  And we – we stay in close touch with the industry.  We have many clients who have owned big boats, boats of this size, where we're constantly in touch with builders and shipyards to know what values are.  And that alone makes us aware of what these values would be.

Q.      Now, I want to be clear.  The $4 million is a diminished value?

A.      The $4 million is the value to – to repair the structural inadequacy of the vessel.

Tr. 913-15.

        I first note that there is no testimony tying the damage from the excess weight to either a cost of repair or a diminished value.  Furthermore, Kirilloff did not state that he conducted a study of the market value of the yacht as delivered, with the structural problem and vibration, versus the market value of the yacht if it conformed to the contract specifications.  He briefly mentioned his expertise with market values of big yachts but did not give any specifics.

PAGE 6 - OPINION AND ORDER

Most importantly, however, Kirilloff clearly stated that the $4 million in diminished value is actually the cost to repair the structural inadequacy of the vessel. But in that estimate, Kirilloff testified that he would have to investigate whether the hull panels had yet been fixed as stated in the ABS technical file. Thus, he does not know if a repair of hull panels is still needed. That undercuts Kirilloff's $4 million estimate because he is not even sure which repairs must still be performed.

A more significant problem in the same vein concerns the vibration. Merhige, and thus Kirilloff, did not know what is causing the vibration and admitted that further testing was required to determine the cause and the needed repair. The cause of the vibration could require a $4 million repair, or a $100,000 repair, or a $10 million repair. It is possible that the vibration cannot be fixed. I do not know and neither do Yacht West's experts. This is not a matter of experts for each side disagreeing and the jury picking whom to believe. Instead, it is a matter of nobody knowing how to solve the problem. With this lack of understanding, the only reasonable way to present damages evidence would be in a straight diminution of value analysis based on the market value of the yacht as delivered versus as promised. If Yacht West performed that analysis, it did not present the results to the jury.

Substantial evidence does not support the jury's award of $2 million for breach of contract as a result of a structural problem which caused a vibration or excess weight. I grant the motion for judgment as a matter of law on that issue and deduct that portion of the award.

B.    Exhaust System Problem

The jury awarded Yacht West $2.6 million for breach of contract concerning the exhaust system.

PAGE 7 - OPINION AND ORDER

CSY notes that the expert's proposed design did not leave the hull below the water line, as required by the contract. Thus, CSY argues that there is no proof on the cost to reroute the exhaust in a manner that would comply with the contract specifications, leaving the jury to speculate as to that cost. CSY claims that the expert performed a cursory analysis resulting in a proposed design without any detailed engineering and without any breakdown of how the costs added up to the requested $2.6 million. CSY also doubts that the proposed design would pass regulatory muster, satisfy engine manufacturer requirements, or be acceptable to the yacht owner.

Yacht West argues that the fact of damage is clear because the exhaust discharge does not exit aft of the propellers, as required by contract. Because the yacht was custom built, Yacht West claims that it is entitled to get precisely what was specified in the contract. According to Yacht West, expert Kirilloff provided sufficient testimony to quantify the exhaust-related damages at $2.6 million. Kirilloff had the necessary experience, conducted an adequate analysis, and broke down the estimate into its component parts. Yacht West also contends that the lack of cross-examination on Kirilloff's damages estimate supports the reasonableness of his analysis.

Yacht West's expert Kirilloff testified that it would cost roughly $2.6 million to refit the yacht with an aft-leading exhaust. Kirilloff included in the cost estimate money to cover engineering fees, ABS classification fees, and shipyard fees. He made a conceptual drawing, and not a final engineering drawing, showing where the exhaust would run and noting some of the cabins and machinery that would have to be rearranged. Kirilloff, however, did not prepare a final drawing which relocated everything necessary to move the exhaust. On Kirilloff's conceptual drawing, the exhaust output was above the waterline, contrary to the yacht's

PAGE 8 - OPINION AND ORDER

specification.  Kirilloff took about 30 hours to prepare his report on the exhaust relocation.  After 30 years of experience, Kirilloff does not believe it is necessary to produce a detailed final engineering drawing when performing a feasibility study.  He testified that there were probably a half dozen configurations that would work and that the concept drawing did not show exactly where the output would have to be.  Kirilloff believed that he had the experience and sufficient drawings and analysis of the problem to estimate the cost to relocate the exhaust at $2.6 million.

Kirilloff's testimony about the exhaust relocation is in stark contrast to his testimony about the cost to repair the structural problem.  Kirilloff has experience rerouting exhausts in other yachts.  He spent 30 hours conducting a feasibility study which resulted in conceptual drawings showing how the exhaust could be rerouted, in a general fashion.  Although Kirilloff did not work out the detailed engineering decisions in the drawings, he testified that there were probably about a half dozen configurations that would work.  Based on his experience and the amount of time he spent studying the exact problem, I am not concerned that Kirilloff did not produce final engineering drawings and that his conceptual drawing did not have the exhaust exiting below the waterline, as required by the contract.  There is substantial evidence on which the jury could conclude that Kirilloff could finalize engineering drawings that would meet the contract specifications and that the cost of repair would be $2.6 million.  Accordingly, I deny the motion for judgment as a matter of law on the exhaust relocation issue.

II.    Yacht West's Motions

The jury awarded CSY $3,272,858 on its counterclaim for breach of contract based on construction and delivery delays.  The amount matches the testimony of CSY's delay expert, George Householder.

PAGE 9 - OPINION AND ORDER

Yacht West raises a few arguments against the entire award and several other arguments against subparts of the award.

CSY claims that Yacht West failed to preserve significant portions of its motion, attempts to substitute its evaluation of the evidence for that of the jury, and refuses to acknowledge applicable law. CSY contends that the court should not disturb the jury's verdict on the counterclaim for any of the reasons raised by Yacht West.

A.    Contract Compliance

Yacht West argues that the Verdict necessarily assumes that the entire 403-day delay was caused by Yacht West's changes to the scope of the décor work. Referring to Section 6 of the contract, Yacht West contends that CSY is barred from receiving any delay damages because it failed to comply with the requirement of providing a written explanation with the proposed change order for that work.

Yacht West claims that Section 7.2(c) of the contract concerns delay days and does not satisfy the notice requirement under Section 6 for compensation for delay. If the court concludes that the notice CSY gave under Section 7.2 is sufficient, Yacht West contends that it was untimely. Alternatively, Yacht West argues that CSY is not entitled to delay damages under Section 18.1. Yacht West claims that Section 18.1's triggers–a delay of more than 31 days caused by events described in Section 7.2(a) or 7.2(d)–did not occur and that any notice was not within the ten day window applicable to Section 7.2(d).

CSY claims that the notice Frye provided to Yacht West representatives Sheer and McConville every month in the form of contract summaries is adequate to satisfy the contractual notice requirement. CSY argues that the court properly instructed the jury on its role in contract

interpretation to give effect to the intent of the parties at the time they entered the contract.

According to CSY, the contract analysis must begin with Section 18.1, interpreted so the

Delivery Date listed in that section is the original delivery date of September 1, 2006, without

any extensions.  According to CSY, the interaction of Sections 18.1 and 7.2 preclude extending

the delivery date in Section 18.1.  Further, CSY contends that the "notwithstanding" language in

Section 18.1 makes the notice requirements of Section 7.2 inapplicable.  CSY thus claims that

the jury accepted CSY's interpretation of the contract and rejected Yacht West's.

The following contract provisions are at issue:

6    RATES.  All Change Order or Work Order pricing shall be based on the net change in materials and labor, at the material markup and labor rates set forth in the Materials and Labor Rate Schedule attached as Exhibit F.  If, however, Builder believes that any change or additional work will result in increases in Builder's costs above its charges under the Materials and Labor Rate Schedule due to construction delays resulting from the change or additional work, Builder may include the excess expenses in its pricing, provided that Builder includes a written explanation, with appropriate backup documentation, of the excess expenses with the proposed Change Order or Work Order.  In any event, Builder may not claim additional compensation for any change or additional work beyond that reflected in the relevant Change Order or Work Order.

7    DELIVERY; EXTENSION; TITLE.

7.1    Delivery.  Builder shall tender delivery of the Motor Yacht to Customer within (856) days after execution of this Agreement and receipt of the first payment required by the Payment Schedule, subject to extensions to the Delivery Date as provided herein.  Such date, as so extended, is referred to herein as the "Delivery Date[."]  The date the Motor Yacht is tendered for delivery to Customer is herein referred to as the "Tender Date[."]  . . .

7.2    Extension of Delivery Date.  The Delivery Date shall be extended for each of the following causes:

(a)  delay in payment pursuant to Paragraph 3.2 [for every calendar day a payment by Customer is delayed past the due date thereof, the Delivery Date, as defined in Paragraph 7.1, shall be extended by two (2) calendar days];

PAGE 11 - OPINION AND ORDER

(b)  changes and additional work pursuant to Paragraph 5 to the extent referenced in the Change or Work Order;

(c)  delays due to increases in the scope of interior and décor work beyond 13,000 hours;

(d)  delays, caused by Customer's, Customer's representative's, or Customer's interior designer's failure to provide necessary items, materials, equipment, or information (including any instructions, changes, approvals, drawings, specifications, or definitions) by the date required under this Agreement, other written agreement between Builder and Customer, or written notice (permitting a reasonable period to respond) from Builder to Customer, Customer's representative, or Customer's interior designer;

(e)  [delays caused by unavailability of parts];

(f)  [delays caused by labor unrest or acts of God];

Notwithstanding the above, Builder shall be obligated to provide notice of any delay resulting from any event described in subsections (c) through (f) within ten (10) days of the occurrence of the event or otherwise, the Builder's rights to claim delay based on such event shall be deemed waived.

. . . .

18.1    Cost After Customer Delay.  Notwithstanding any other provision to the contrary, if the delivery of the Motor Yacht is delayed past the Delivery Date for over thirty-one (31) calendar days due to delays described in Paragraph 7.2(a) or (d), Builder may charge Customer for its additional out-of-pocket costs resulting from the further delay, including insurance, supervision, bay rent, and rescheduling and restocking costs.

Foley Decl. Ex. 9 at 4-6, 14-15.

Yacht West correctly notes that the term "Delivery Date" is defined in Section 7.1 to

include extensions falling within Section 7.2.  I agree with CSY, however, that the only way to

read Section 18.1 in harmony with Section 7.2 is to conclude that the Delivery Date referred to

in Section 18.1 is not extended by events described in Section 7.2(a) or (d).  Under Yacht West's

contrary interpretation, Section 18.1 is nonsensical because the delivery of the yacht can never

PAGE 12 - OPINION AND ORDER

be delayed 31 days past the Delivery Date that is extended by the same event.  Contracts are

interpreted to give meaning to every term.  <u>Diamond B. Constructors, Inc. v. Granite Falls Sch.</u>

<u>Dist.</u>, 70 P.3d 966, 970 (Wash. Ct. App. 2003).

Several witnesses–Joe Foggia, Kevin Harrison, and Robert Emerson–testified about

delays caused by Yacht West's interior designer, Pavlik Yacht Design, when the company was

slow to provide drawings and information on the selection of décor items.  This type of delay

falls within Section 7.2(d).  Emerson stated that the untimeliness of information from Pavlik

greatly impacted the project.  Householder testified that delays caused by the décor totaled 405

days and delays caused by the marble and stone contractor, chosen by Yacht West or Pavlik,

totaled 336 days.  There is enough evidence for the jury to conclude that over 31 days of delay

were caused by Yacht West's interior designer or other representatives.  Thus, there was

substantial evidence for the jury to conclude that Section 18.1 was triggered.  Because

Section 18.1 begins with the term "[n]otwithstanding any other provision to the contrary," the

notice requirements of Sections 6 and 7.2 do not apply.  Thus, there is no need to address

whether Frye's monthly contract summaries were sufficient notice.

      B.     <u>Causation for the Entire 403-Day Delay</u>

Yacht West contends that the entire award of delay damages should be set aside because

there is insufficient evidence that Yacht West caused all of the delays and CSY caused none of

the delays.  Because CSY did not apportion the delay days between the owner and builder based

on cause, Yacht West claims that CSY cannot recover for any of the delay.

CSY argues that there is testimony from numerous witnesses that the entire delay was

caused by Yacht West's failure to timely provide design information, Yacht West's stone

PAGE 13 - OPINION AND ORDER

subcontractor's failure to follow the construction schedule, and Yacht West's huge expansion of the scope of the décor work.

Householder's testimony is sufficient to support the jury's conclusion that the entire 403-day delay was attributable to Yacht West and was not extended by any delay caused by CSY.  Householder apportioned the delay by determining that Yacht West's delay was controlling.  The jury is entitled to accept his opinion.

      C.     <u>Testimony of Expert Householder</u>

CSY grounded its claim for delay damages on the testimony of its expert, George Householder.  Yacht West argues that Householder's opinion did not meet the requirements of Federal Rule of Evidence 702 and should have been excluded.  Yacht West notes that Householder relied on a CSY employee, Frye, to provide all of the data for the damages calculations, Householder performed none of the analysis to support the calculations, and Householder did not verify CSY's analysis.  If Householder's testimony is excluded, there is no basis for any of CSY's damages award.

CSY contends that it is within the jury's realm to weigh criticisms of an expert's assumptions and method of calculating damages.  I agree:

> To the extent [defendant] sought to challenge the correctness of [plaintiff's] experts' testimony, its recourse is not exclusion of the testimony, but, rather, refutation of it by cross-examination and by the testimony of its own expert witnesses. . . .
>
> Authority to determine the victor in such a "battle of expert witnesses" is properly reposed in the jury. . . .
>
> As to the reasonableness of the assumptions underlying the experts' lost profit analysis, criticisms of an expert's method of calculation [are] a matter for the jury's consideration in weighing that evidence.  It is for the trier of fact to

accept or reject this evidence, and this evidence not being inherently improbable provides a substantial basis for the trial court's award of lost profits.

Humetrix, Inc. v. Gemplus S.C.A., 268 F.3d 910, 919 (9th Cir. 2001) (internal quotation omitted). Householder's testimony on delay damages was supported adequately to survive a challenge under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993). If jurors were not dissuaded by Yacht West's cross examination of Householder, they are entitled to accept his testimony.

CSY further argues that an expert can testify based on work the expert did not personally do. Case law supports CSY's argument: "The fact that [the expert's] opinions are based on data collected by others is immaterial; Federal Rule of Evidence 703 expressly allows such opinion testimony." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1142 (9th Cir. 1997).

All of Yacht West's objections to Householder's testimony were matters for cross examination or contradiction by another expert. Yacht West was unable to convince the jury that its concerns undermined Householder's testimony to the point that the jury should reject his opinions. None of Yacht West's objections are a reason for the court to exclude Householder's testimony.

D.    Award for Use of Overtime

The delay damages award included three components based on CSY's use of overtime to complete the yacht: (1) $162,280 for actual overtime paid; (2) $48,000 for an early delivery bonus; and (3) $78,370 for inefficiency and disruption related to decreased worker productivity during overtime hours. In addition to the written notice requirement explained above, Yacht West raises other arguments against the overtime components.

PAGE 15 - OPINION AND ORDER

Yacht West contends that CSY is barred from receiving the $162,280 in actual overtime because it did not comply with Section 5.4 of the contract which requires the builder to obtain advance written approval before charging overtime rates.  CSY argues that overtime can be awarded as a component of the damages under Section 18.1 which, as discussed above, does not require written notice as in other contract sections.

For the reasons stated above, I conclude that Section 18.1 does apply and that the notification requirements of Section 5.4 do not apply.

Yacht West claims that CSY is not entitled to the $48,000 early delivery bonus because the yacht was delivered 30 days past the latest date extended by the change orders.

Householder admitted that the delivery date was extended to September 9, 2007 and the boat was not delivered until October 9, 2007.  He conceded that he could not decide if CSY was entitled to the early delivery bonus under the contract.  Householder believed that he could make the argument that the overtime resulted in the boat being delivered 48 days earlier than it would have been if the overtime was not worked.

Section 7.3 provides for an early delivery bonus of $1,000 per day for each day the boat is delivered before the delivery date, as extended by change orders.  The yacht was not delivered early under that definition so the bonus cannot be awarded under Section 7.3.  Section 18.1 provides for additional out-of-pocket costs resulting from particular delay.  I do not see any way to interpret the early delivery bonus as an out-of-pocket cost.  I conclude that substantial evidence does not support the $48,000 early delivery bonus and will deduct it from the award.

Finally, Yacht West raises a slightly different causation argument by contending that there is no evidence that Yacht West caused CSY to use all of the overtime to complete the

PAGE 16 - OPINION AND ORDER

yacht.  Yacht West claims that some overtime was incurred as a result of CSY's staff shortages in all departments.

CSY argues that there is no evidence that any manpower shortages caused any delay in the construction of the yacht.  I am unpersuaded by Yacht West's argument for the reasons stated above in the Causation section.

      E.     Eichleay Damages

Yacht West raises several additional arguments against the $1,598,616 the jury awarded in Eichleay damages.  The Eichleay formula calculates the amount of unabsorbed home office overhead a contractor can recover when the owner suspends or delays work on a contract for an indefinite period.  P.J. Dick Inc. v. Principi, 324 F.3d 1364, 1370 (Fed. Cir. 2003).

CSY contends that Yacht West waived all arguments against the award of Eichleay damages because Yacht West "did not request specific jury instructions requesting that the Court pose these questions to the jury."  Mem. in Opp'n to Pl.'s Mots. for J. as a Matter of Law at 18.

CSY cites EEOC v. Pape Lift, Inc., 115 F.3d 676 (9th Cir. 1997), which held that Pape waived its argument that the plaintiff was obligated to lower his sights in order to procure employment because Pape "never requested an instruction on the so-called 'lowered sights' doctrine; the jury was instructed only that Waters must seek a job of 'like kind, status and pay,' and it reasonably concluded that no such job was available."  Id. at 683.

To the extent that Yacht West contends that the Verdict should have included interrogatories determining if CSY proved each subelement of Eichleay damages, I reject the argument.  It is not my practice to pepper the jury with interrogatories of this nature and Pape Lift does not require it.  Pape Lift addresses an instruction on a legal theory.

PAGE 17 - OPINION AND ORDER

Turning to Yacht West's arguments, it first contends that CSY was not on standby during construction of the yacht and consequently is not entitled to Eichleay damages. CSY claims that courts have awarded Eichleay damages for instances where work on a project was extended as opposed to suspended. Because this argument is dispositive, I decline to address the other arguments Yacht West raises against the Eichleay damages.

To recover Eichleay damages for unabsorbed home office overhead, the contractor must prove that the owner required the contractor to remain on standby during the delay. P.J. Dick, 324 F.3d at 1370.

> Our early decisions do contain some statements that arguably support the notion that suspension of the work and idleness are not prerequisites to a determination that the contractor is on standby. . . . At no time, however, has this court *held* that a contractor has been placed on standby merely because a government-caused delay of uncertain duration occurred, at the end of which the contractor must be ready to resume work. . . . Indeed, every case where this court has held a contractor to be placed on standby has involved a complete suspension or delay of all work or at most continued performance of only insubstantial work on the contract.
>
> In addition to being implicit in our early cases, our later decisions explicitly state that such a suspension or delay of the work on the contract is a prerequisite to a finding that the government placed the contractor on standby.

Id. at 1371-72. Accord Strand Hunt Constr. v. Lake Washington Sch. Dist. No. 414, No. 56910-4-I, 2006 WL 2536315, at *6-*7 (Wash. Ct. App. Sept. 5, 2006).

There is no evidence that CSY was ever on standby.

CSY cites unpersuasive cases to support its argument that courts can award Eichleay damages for extended, but unsuspended, projects. One case on which it relies, C.B.C. Enterprises, Inc. v. United States, 24 Cl. Ct. 187 (1991), aff'd, 978 F.2d 669 (Fed. Cir. 1992),

gives a multi-page explanation for its holding that the contractor was not entitled to Eichleay

damages, including:

> When a contract period is extended for additional work, rather than a suspension
> of work, home office overhead generally can be calculated more accurately by
> applying a percentage overhead markup to direct costs rather than by use of the
> Eichleay formula.  This is so because, by definition, a suspension of work means
> that little or no work is being performed, with a corresponding decrease in direct
> costs incurred.  Thus, applying a percentage overhead markup to direct costs
> would produce little or no overhead, and would not adequately compensate the
> contractor for overhead costs incurred.  On the other hand, when changes are
> made to add work, and the performance period is extended solely to accommodate
> the extra work, as in the present situation, there is an ongoing level of work which
> usually produces sufficient direct costs such that the contractor generally is
> adequately compensated by applying a percentage overhead markup to direct
> costs.

Id. at 190-91 (internal citation omitted).

C.B.C. did state that there "may be instances where use of the Eichleay formula to

calculate home office overhead is justified in unusual situations where work performance

extension is involved."  Id. at 193.  But C.B.C. held that the situation before it was not so

unusual and distinguished CSY's other case, Savoy Constr. Co., No. 21218, 85-2 BCA ¶ 18,023,

1985 WL 69190 (A.S.B.C.A. Apr. 23, 1985), because the Savoy Board found that a percentage

markup of direct costs would not adequately compensate the contractor.  CSY has not made an

equivalent showing.

Consequently, I conclude that the law does not support an award of Eichleay damages to

CSY and deduct $1,598,616 from the award on CSY's counterclaim.

## CONCLUSION

Plaintiff Yacht West's Motion for Judgment as a Matter of Law on Christensen

Shipyards, Ltd.'s Counterclaim (#231) and Defendants Christensen Shipyards, Ltd. and David H.

Christensen's Motion for Judgment as a Matter of Law (#234) are granted in part.  I ask counsel to attempt to submit by April 5, 2010 a jointly proposed Amended Judgment which reflects the above rulings.

IT IS SO ORDERED.

Dated this _____22nd_____ day of March, 2010.

_____/s/ Garr M. King_____
Garr M. King
United States District Judge

PAGE 20 - OPINION AND ORDER